WESTERN UNION TELEGRAPH COMPANY *v.* MISSISSIPPI RAILROAD COMMISSION.

1. TELEGRAPH COMPANY.    *State police regulations.*

A telegraph company, engaged in domestic as well as interstate business, is subject to such reasonable police regulations as the state may impose.

2. SAME.    *Chartered by another state.    Lines erected by authority of congress.*

In such case it is immaterial that the company was chartered by another state and secured its right to erect its lines along the post roads in this state under an act of congress.

3. RAILROAD COMMISSION.    *An administrative agency.    Findings not conclusive.*    § 4284, *code* 1892.

The findings of the railroad commission are, under § 4284, code 1892, not final and conclusive.    Although in some respects it exercises *quasi* judicial power, the commission is an administrative agency, and its conclusions are subject to judicial inquiry.

FROM the circuit court of Jefferson county.

HON. WM. P. CASSEDY, Judge.

This suit was instituted by the Mississippi Railroad Commission against the Western Union Telegraph Company for the penalty provided by § 4329, code 1892, for a failure to comply with § 4328 of said code. The code sections read thus:

"4328. *Telegraph and express companies to maintain necessary offices, etc.*—Every telegraph and express company shall establish and maintain offices for the transaction of business with the public, in their respective capacities as common carriers, at each city, town and village convenient to its routes, if, in the opinion of the railroad commission, the public convenience and necessities require it; and they shall not discontinue an office, once established, without the consent of the commission, which has authority to require such companies to establish and maintain offices, and to require telegraph companies to keep night operators at every place where, in its judgment, the business and public convenience justify and require it.

"4329. *Penalty on carriers for violating the law.*—If any railroad or other common carrier shall violate any of the provisions of this chapter, or shall fail to do and perform any duty imposed by law, or shall fail to comply with any lawful order of the commission, or to conform to any of its reasonable rules and regulations, or shall demand or receive a greater sum for the transportation and handling of any passenger or freight than authorized by law or the commission, it shall be liable to a penalty of five hundred dollars for every such failure or overcharge not otherwise punished, to be recovered by action in the name of the commission in any county where such failure may occur or overcharge be made; but in trials of cases brought for a violation of any tariff or charges as fixed by the commission, it may be shown in defense that such tariff, so fixed, was unreasonable and unjust to the carrier."

The constitution of the state provides: "Section 195. Ex-

74 Miss.—6

press, telegraph, telephone, and sleeping car companies are declared common carriers in their respective lines of business, and subject to liability as such."

Acting under these provisions of law, the plaintiff began its suit, and charged in its declaration that the telegraph company, having previously established an office at Fayette, in Jefferson county, applied to the commission for permission to abandon the office, which request the commission refused, because, in its opinion, public convenience and necessity required the maintenance of the office; that after this refusal of consent, the telegraph company, without authority, abandoned the office.

The defendant's second plea set up that it was a New York corporation, that it was not doing business in Mississippi by reason of any grant, right, privilege, franchise, or immunity obtained from this state; that it obtained its right to erect its lines along the post roads of the state under an act of congress, and that the office at Fayette was on such a road, and was established before the creation of the railroad commission, and before the enactment of the law under which the suit was brought, and that the company was engaged in interstate commerce. To this plea a demurrer was interposed, and it was sustained.

The defendant's third and fourth pleas set up the matters averred in the second plea, and, in addition, that the receipts and business at the Fayette office were insufficient to pay the expense of keeping it open for business, and that if maintained it would necessarily be at a loss to the company. The court below sustained demurrers to these pleas. A trial was had on the first plea, which was a general traverse of the declaration, and a judgment obtained for the plaintiff. The defendant appealed.

*Mayes & Harris*, for appellant.

If the conclusions of the railroad commission under the statute, § 4328, code 1892, are subject to judicial inquiry, the pleas held bad upon demurrer in the court below set up facts which

amply justified the appellant in closing its office at Fayette. But if the statute be construed as leaving the question absolutely subject to the will of the commission, then it is unconstitutional and utterly void.

The statute, so far as a very exhaustive research by us has disclosed, is unique—is *sui generis;* it stands alone, without precedent. It is not even in harmony with other sections of the chapter relating to the supervision of common carriers, of which it forms a part. The section should not be construed as having a retroactive operation; it should not be applied to offices which were in existence at the time of its enactment. To construe the section as so applying, and as leaving the whole matter in the discretion of the commission, renders it utterly indefensible, either by precedent or on principle, and makes it violative of the fundamental principles and most cherished provisions of both the state and federal constitutions. It arbitrarily appropriates the property of existing telegraph companies to public use without any pretense at compensation; it deprives the companies of property without due process of law; and it denies the companies the equal protection of the law. It is in derogation of common right, in that it deprives the companies of the right and freedom accorded to every other person—that of pursuing or abandoning a lawful occupation at will.

So construed and applied, when fully analyzed and reduced to its real value, it must be treated as if written thus: "A telegraph company shall not discontinue an office once established." The words, "without the consent of the commission," adds nothing, and should be treated as superfluous, because there is no provision by which the consent of the commission can be obtained. A telegraph company is as defenseless as if the words were omitted. The difference is immaterial between saying, "You shall not dispose of your property," on the one hand, and averring on the other, "You shall not dispose of your property without the consent of A," when no provision is made by which that consent can be obtained. In either case,

one of the most valuable and essential attributes of ownership is taken from you absolutely; namely, the right of disposition. It is perfectly obvious that the value to the owner under such restrictions would not only be greatly diminished, but, in many instances, wholly destroyed, and, in some instances, no doubt, the very ownership would become an intolerable burden.    The elementary text-books, treating of the right of the state to impose burdens upon the owners of property, tell us that all ownership is subject to certain qualifications, and that the state has the right to take private property for public use in certain instances: (1) By taxation, (2) by the exercise of the right of eminent domain, (3) public necessity (*salus populi suprema lex*—a branch of police power), and (4) in the exercise of what is called the police power.

Manifestly, the provision under discussion cannot find its defense in the taxing power.    It cannot be defended as the exercise of the right of eminent domain, because no pretense of compensation or hearing is provided for or contemplated.    It cannot fall under the head of public necessity.   That right is based upon the maxim, *salus populi suprema lex*, and justifies the destruction or appropriation of private property to public use in cases of emergency—as, for instance, in time of war, or when property is destroyed to prevent the spread of fire or pestilence.    The statute cannot be defended upon this ground; and, if defensible at all, it must be as an exercise of the other branch of police power, and we cannot find any recognized principle which gives support to the statute thereunder.

The basic principle upon which all legislation on the subject of regulating business concerns rests (and the judicial decisions trace it to this source), is to be found in the following extract from the treatise *De Portibus Maris*, by Lord Hale: "A man, for his own private advantage, may, in a port or town, set up a wharf or crane, and may take what rates he and his customers can agree upon for craneage, wharfage, etc., for he doth no more than is lawful for any man—namely, make the most

of his own.   If the king or subject have a public wharf unto which all persons to that port must go to lade and unlade their goods, as for the purpose, because they are the only wharfs licensed by the king, or because there is no other wharf in that port, as it may fall out where the port is newly erected; in that case there cannot be taken arbitrary and excessive duties for craneage, wharfage, etc.   Neither can they be enhanced to an immoderate rate; but the duties must be reasonable and moderate, though settled by the king's license or charges, for now the wharf, crane or other conveniences are affected with a public interest and they cease to be *juris privati* only.''   This clause is also quoted in the opinion of the court in *Munn* v. *Illinois*, reported in 94 U. S., 113, and is cited with approval as announcing the principle on which the decisions are based.

Now, we see, in analyzing this statement of Lord Hale, that the fact that the business is affected with a public interest has the effect of limiting the extent to which the owner can charge, and prevents the exaction of excessive duties or immoderate rates.   It is nowhere intimated in this celebrated passage that because the crane or wharf is affected with the public interest, the state would have a right to confiscate the wharf or crane, or that, because it was affected with the public interest, the state would have the right to forbid the owner to cease operating it at any time he might see fit, or to compel him to establish other cranes or wharves.   The extent of the power is to regulate the use, and not to compel a continuance of the use, or give the right to the state to appropriate property to its use without compensation, simply because it was affected with a public interest.

In the case of *Munn* v. *Illinois*, *supra*, Mr. Chief Justice Waite said: "Under these powers, the government regulates the conduct of its citizens one towards another, and the manner in which he shall use his property when such regulation becomes necessary for public good.   In their exercise, it has been customary in England from time immemorial, and in this

country from its first colonization, to regulate ferriers, common carriers, hackmen, bakers, millers, wharfingers, etc., and in so doing fix the maximum of the charge to be made for services rendered, accommodations furnished, and articles sold.''

We see, therefore, that the authority upon which the court bases the right to regulate the charges and affairs of a warehouseman or a railroad company or a telegraph company, is derived from the same principle on which the right to regulate hackmen, bakers and millers is based.

Now, what would we say of an act of the legislature that would provide that a bakery, once established, should not be discontinued; or that hacks, once established, should not cease to run; or that millers should continue to grind so long as ''A'' or ''B'' required, or that the business should be extended when and where, in the opinion of ''A'' and ''B,'' the public interest required.  We stand aghast at the effect, when we undertake to apply this provision to these homely industries. But surely there is not one law for the baker and another for the telegraph company, or a different law for the hackman and the miller.  What is law for one is good law for the other. It may not be put in force in reference to bakers or millers or hackmen, but, at the same time, if it is valid law in regard to the telegraph companies, a law which will say that bakers must continue to bake and millers continue to grind and hackmen continue to drive, would be equally defensible.  It would make no difference in the case of the baker, if competition had reduced his business to a ruinous basis; it would make no difference to the hackman that the revenues which he obtained for the use of his hacks would not afford him a just return for his labor and for the money invested; it would make no difference with the miller that sufficient grist did not come to his mill to pay the wages of his employees, he must grind on.  The baker must continue to buy flour and bake loaves whether he can sell them or not.  If he had a dozen bakeries, he could not discon-

tinue one to reduce his expenses; and, on the same principle, if the party to whose discretion the matter was confided saw fit to so determine, he could be compelled to establish other bakeries where, in the opinion of the dictator, the public interest would be subserved.

The right to regulate the use does not involve the right to compel the continuance of the use or the right to compel a citizen to devote his money, his time, or his labor, to public use without reward, or of depriving him of his liberty in regard thereto.

The court must see at a glance the disastrous and blighting effects of such legislation on all public enterprises. Who would embark in a business if the state could, at any time, arbitrarily lay its hands upon it and forbid its discontinuance, and compel him, against his will, to continue it or extend it? Such an exercise of power is utterly incompatible with the principles of a free government and contrary to the spirit of our institutions. It strikes not only at the root of the right of private property, but at the right of personal liberty as well.

We have used the homely illustrations above because they serve to throw a true and startling light on the possibilities of such legislation as that under consideration. When a corporation is the subject of legislation, we are too apt at times to allow that fact to blind us to the far-reaching consequences of the measures sought to be applied to it. It must not be forgotten, however, that the constitution, which takes under its protecting ægis the right of personal security, the right of personal liberty and the right of private property, places these three absolute rights on the same basis and extends its protection to the rich and poor alike—to corporations as to natural persons. A private corporation is a person within the meaning of the constitution. *Santa Clara County* v. *Southern Pacific Railroad*, 118 U. S., 394.

The fact that the business is carried on by a corporation cannot affect the question. It is not the character of the person

which determines the rightfulness of the exercise of the power, but it is the character of the business which determines. It is true, a charter may cut a very material figure in determining the rights of the state and of the corporation in a particular case, but the fact of incorporation does not affect the principle. A man whose money is invested in the stock of a telegraph company is entitled to the same protection as one whose money is invested in a bakery or in a hack.

The fact that the companies are not dispossessed of their plants does not make the act constitutional, nor give it support. Nor does the fact that they may earn a profit cut any figure. Their earning a profit from the business is accidental and contingent on conditions which they cannot control, and does not necessarily follow. We have shown that conditions may arise, and are likely to arise, which would render the continuance of the business ruinous to the company, under the operation of the statute. The fatal defect in the law, as construed by the court below, is that it makes no provision for this. From one point of view, it might have been infinitely better for the companies if the state had actually dispossessed them and assumed the burdens as well as the benefits. As the law now operates, the state is the certain gainer, while the companies are saddled with all the risks, all the burdens, all the expenses, and all the loss.

"As property is the right to the entire or partial use or occupation or enjoyment of some specific thing, it may be taken by abrogating the right, or so dealing with the thing that the right cannot be beneficially executed or enjoyed." 1 Hare on Constitution, 383.

" It is, notwithstanding, clear, as I have already stated, that the prohibition is not confined to the actual taking, but it includes every enactment which deprives the owner of rights in which property consists, or precludes him from putting his land or his goods to their appropriate use. He cannot, save in the due exercise of the police power, where the case impera-

tively requires it, be forbidden to sell or directed how to hold or enjoy; nor can the use or the sale be placed under restrictions which amount to the prohibition or render the property valueless or useless. If the legislature can thus restrict the future acquisitions of a citizen, it has no such power over existing rights." 2 Hare, 755–759.

" Where a law annihilates the value of property, or strips it of its attributes by which alone it can be distinguished as property, the owner is deprived of it according to the plainest interpretation, and certainly within the constitutional provision intended expressly to shield personal rights from the exercise of arbitrary power." *Wynchamer* v. *The People*, 13 N. Y., 378–398.

" Depriving the owner of property of one of its attributes, is depriving him of his property within the constitutional provision." *People* v. *Otis*, 90 N. Y., 48; *In Re Jacobs*, 98 N. Y., 106.

"The third absolute right in every Englishman, is that of liberty, which consists in the free use and enjoyment of all his acquisitions, without any control or diminution save only by the law of the land." Blackstone's Commentaries, 138, 139.

" Depriving a company of the power to charge reasonable rates for the use of its property, and such deprivation taking place in the absence of an investigation by judicial machinery, deprives it of the lawful use of its property, and thus, in substance and effect, of the property itself." Blachford, J., in *Railroad Co.* v. *Minnesota*, 134 U. S., 462.

" One may be deprived of his liberty and his constitutional right thereto violated, without actual restraint of his person. Liberty, in its broad sense, as understood in this country, means the right, not only of freedom from servitude, imprisonment or restraint, but the right of one to use his faculties in all lawful ways, to live and work where he will and to earn his livelihood in any lawful calling and in the pursuance of any lawful trade or avocation." *In re Jacobs*, 98 N. Y., 106.

Who will have the temerity to say that these constitutional provisions are not violated by an enactment which arbitrarily and absolutely prohibits one from abandoning a business if he sees fit to do so, or from reducing its limits when the exigencies of the business may require, or which arbitrarily compels him to extend it. The authorities above cited apply with peculiar force under a constitution like that of Mississippi, which contains this provision:

"SEC. 17. Private property shall not be taken or damaged for public use, except on due compensation first being made to the owner or owners thereof in a manner to be prescribed by law."

*Wiley N. Nash*, attorney-general, for the appellee.

The two sections of our law, §§ 4328 and 4329, code 1892, under which the forfeiture was incurred, were enacted by the legislature in order, doubtless, to carry out the mandate of our state constitution, which provides "that the legislature shall pass laws to prevent abuses, unjust discrimination, and extortion in all charges of  .   .   . telegraph companies, and shall enact laws for the supervision of  .   .   . telegraph companies  .   .   . by commission or otherwise, and shall provide adequate penalties to the extent, if necessary for that purpose, of forfeiture of their franchises." And the constitution further provides (§ 195), that telegraph companies are common carriers in their business, and subject to liability as such.

Now, the only question in this case is this: Was the judgment, order, and determination of the railroad commissioners, in ordering the Fayette office kept open, right and proper? That it was not right and proper was the only defense that could have been made in the court below. By § 4284, code 1892, it is provided "that whenever any matter is determined by the commission in the course of any proceeding before it, the fact of such determination, duly certified, shall be received in all the courts and by every officer in civil cases as *prima facie* evidence that such determination was right and proper."

In this case, under the declaration and the general issue, all necessary and proper matters could have been tried and determined by a jury of the country, with an appeal to the supreme court by either party, if desired. The special pleas were wholly unnecessary, and the court below cannot be said to have committed reversible error in sustaining demurrers to them, and this without reference to the facts sought to be set up by them. Appellant must show error in some other part of the case before becoming entitled to a reversal. I have yet to learn that it is necessary to specially plead the unconstitutionality of a particular act, matter or thing in order to get the benefit of it.

It must be borne in mind that the telegraph company, the appellant, brought the matter of discontinuing the Fayette office before the commission by its petition asking consent for the office to be closed. The commission heard the matter, and adjudged that the office should be continued. Now, I contend that the telegraph company, having submitted to the commission the settlement of this question, having sought and elected this forum, it is bound by its decision. The law is: "An election is binding upon the party making it, and he cannot afterwards pursue an inconsistent remedy, though full recovery may not be had in the first action." 6 Am. & Eng. Enc. L., 250; *Bailey* v. *Hervey*, 135 Mass., 172; Herman on Estoppel and Res Adjudicata, vol. 2, 1178; *Thompson* v. *Howard*, 31 Mich., 309–312.

The pleas do not show that the keeping open of the office in Fayette in any way interferes, or would interfere, with the transmission of messages from one state to another. The attention of the court is called, in this connection, to the case of *Louisville, etc., R. R. Co.* v. *State*, 66 Miss., 671–675.

It is manifest, from the pleas, that the statute is resisted because it imposes a burden, not on commerce, but on the company. The law is clearly constitutional.

Argued orally by *J. B. Harris*, for appellant, and by *Wiley N. Nash*, attorney-general, for appellee.

Cooper, C. J., delivered the opinion of the court.

The demurrer to the second plea was properly sustained. For all that appears by said plea, the defendant company was engaged in domestic as well as interstate transmission of messages, and, if it was, it was subject to such reasonable police regulations as the state saw proper to impose for securing conveniences to the people. The fact that the company was chartered in another state and secured its right to erect its lines along the post roads in the state by virtue of authority derived from an act of congress, does not release it from any and all local police regulation.

The demurrer to the third and fourth pleas should have been disallowed. The findings and determination of matters committed to the railroad commission by it are not final and conclusive, and was never so intended by the statute. It is a mere administrative agency, although, in some respects, it exercises *quasi* judicial power. But at last the reasonableness and consequently the lawfulness of its determination is left subject to judicial inquiry and decision. If a common carrier, required by the commission to do an act, is of opinion that the requirement is a violation of its legal rights, it may refuse compliance, and if, upon judicial inquiry, its contention is supported, is not punishable or liable for a failure to comply. But it takes the risk of coming under all penalties and liabilities declared by the statute, if, upon such inquiry, the courts uphold the action of the commission. The statute, in express language, so provides. Section 4284 of the code declares that "all findings of the commission and the determination of every matter by it, shall be in writing, and proof thereof shall be made by a copy of the same, duly certified by the secretary under the seal of the commission; and whenever any matter has been determined by the commission, in the course of any proceeding

before it, the fact of such determination, duly certified, shall be received in all courts and by every officer in civil cases as *prima facie* evidence that such decision was right and proper."

The facts set up by the third and fourth pleas, and admitted to be true by the demurrers, furnish ample justification for the action of the appellant in closing its office at Fayette.

*The judgment is reversed.*