ATCHISON, T. & S. F. RY. Co. v. STATE *et al.*

No. 438.   Opinion Filed February 16, 1909.

(100 Pac. 16.)

1.   RAILROADS—Duty to Maintain Telegraph Stations. A railway company engaged as a common carrier in the transportation business is not required to install and maintain telegraph stations to receive and transmit messages for commercial purposes, independent of its business as such common carrier.

2.   SAME—Commercial Facilities—Duty to Maintain. A railway company is required to furnish all necessary equipment and facilities for the discharge of its duties as a common carrier; but when such are not reasonable and necessary for such purpose, it is not, independent of its duties as a common carrier, to be required to furnish them, that the public may, commercially, derive convenience therefrom.

(Syllabus by the Court.)

*Appeal from the Corporation Commission.*

Action by the State, and others against the Atchison, Topeka & Santa Fe Railway Company before the Corporation Commission. From the judgment, the Railway Company appeals. Reversed, with directions.

On April 13, A. D. 1908, certain resident taxpayers of the town of Payson and vicinity petitioned the Corporation Commission to investigate the action of the Atchison, Topeka & Santa Fe Railway Company, whereby said company had withdrawn its telegraph operator and the telegraph instruments from its office in said town of Payson, Lincoln county, Okla., representing that since the construction of said railroad the residents of said town of Payson and vicinity have had the use and benefit of a well-conducted telegraph office, and that its absence at said place at said time was detrimental to the entire citizenship of that community, and they prayed that telegraph service be re-established at said station.

On the 2d day of May, A. D. 1908, there was filed with the

Corporation Commission of the state of Oklahoma a response to said complaint, being referred to as "File No. 131," dated April 13, A. D. 1908, to the effect that said telegraph office was closed because it was not needed in the handling of the business of the appellant, it having sufficient facilities for taking care of its business from that station; that on account of the reduction of business it was necessary to curtail expenses as much as possible, and, as the telegraph office at said station was not needed, it was accordingly closed; that as to its commercial business that fall, for the past four months preceding the date of said response, the earnings averaged $1.93 per month; that in the month of February, 1908, the commercial earnings of the telegraph service for said month were 90 cents.

Said cause was set for hearing on the 17th day of August, A. D. 1908, and W. C. Parnell, for the complainants, testified that he lived at Payson, in Lincoln county, Okla., and that the people residing around said station desired a telegraph office, for the accommondation of the public generally, established or re-established there; that Payson is located on the Santa Fe line, about 18 miles north of Shawnee, having about 250 inhabitants, and is about five miles from Meeker and Sparks, one being to the north, the other to the south, each having a telegraph station; that the inhabitants of Payson are subjected to inconvenience in that, if either of them desire to send or receive a message, they have to phone the telegraph operator at either Meeker or Sparks, and, if they are unknown personally to the operator, it is necessary to get the bank at Payson to guarantee the charges at these places; that there is maintained a station agent at Payson by the railway company, but he is not an operator, at least he does not operate the instrument. Witness stated that he had heard that he was an operator, but did not know of his own knowledge; that this agent's duties were to sell tickets and deliver and receive freight. There is no proof as to what it would reasonably cost the company to maintain a telegraph station with an operator at said place. Witness states that the station agent, as to the selling of

tickets and receiving and delivering freight, performed his duties in a satisfactory manner, other than that he did not afford any telegraph service; that the telegraph service was discontinued somewhere in February or March, possibly May, 1908.

The Attorney General propounded the following questions:

"Q. How much does it cost you to communicate with the other office? Mr. Love, Chairman: Mr. Attorney General, I would like for you in all these public service cases to confine yourself—to leave out the cost of everything, and to see whether or not the people are served, as they should be served, by these public service corporations. Mr. Henshaw, Assistant Attorney General: Well, my object was to show discrimination against them. Mr. Henshaw, Assistant Attorney General: Q. Well, have you any means of knowing when trains are coming? Witness: A. Why, no, nothing except the time card. Q. Well, the trains are not bulletined? A. I couldn't say from my personal knowledge if it is or not, but I have understood that he is not using the instrument at all; the signal boards are down, I don't know— Q. What is your business there? A. I am a farmer, own property in our little town, live close in, have some interests in the town, but I live on the farm."

On cross-examination, witness stated that said telegraph office had been maintained at said station of Payson, prior to the time it had been discontinued, about four years; that there were proper station facilities there now. The following questions were propounded to the witness on cross-examination by counsel for the appellant:

"Q. Well, I have the record on it. You know what the receipts from the telegraph business at this station were for 12 months prior— Mr. Love, Chairman: As was stated before, we don't care anything about receipts or anything about that; we are going to eliminate that part of it. Q. The telegraph service at this station the business being discontinued in February, 1908, do you know what the receipts were for telegraph business for 12 months prior to the time when the service was discontinued- Mr. Love, Chairman: Question objected to. Counsel for Appellant: I would like to say the attorney for the Santa Fe now offers to prove what the receipts were at the station of Payson for the telegraph business for each month during the period of 24 months immediately preceding the discontinuance of the service at that

station. Mr. Love, Chairman: It is not allowed by the court. (Exception taken to the ruling by counsel for appellant.) Mr. Love, Chairman: It has no bearing in a case of this nature as all public service corporations having a monopoly of certain special privileges take upon themselves obligations to serve the people first, and then the making of money afterwards. Counsel for Appellant: Q. Mr. Parnell, how far did you say it is from Payson north to Sparks? A. Approximately, six miles; I don't know just how far it is. Q. There is a telegraph office maintained there? A. I think there is, yes, sir. Q. And telephone from Payson to Sparks? A. Yes, sir. Q. How far is it from the station of Payson south to the first station? A. About the same distance —about six miles. Q. What is the name of that station? A. Meeker. Q. Is there a telegraph office there? A. Yes, sir. Q. And there is a telephone from Payson to Meeker? A. Yes, sir. Q. So that the greatest distance any person between these towns would have to go to reach a telegraph office already in existence and furnishing a service would be six miles north or south? A. Yes, sir. I would like to state to the court that Mr. Frank who is a shipper, that he might be interviewed on this particular point. Q. How many stores are there in Payson? A. Well, there is three stores; two stores handling hardware and implements, one drug store, I believe. Q. About 200' people there? A. I think the census report taken last year shows about 200 possibly 250—240 or 250."

The next witness examined on the part of the complainants was W. F. Frank, who testified that he lived at Payson, and that his business was that of a general merchant, and also engaged in the cotton business.

"Assistant Attorney General: Q. Now you may state what inconvenience the lack of telegraph facilities bears upon your business? A. Well, as a business man and from a Western Union standpoint, I have the same report to make that Mr. Parnell has to make. The report from the Chandler office covers my business, and I paid them myself, because I am acquainted there and phone down and paid the bill. I lived and owned property in Chandler before I came to Payson. I also did some business with Sparks and Meeker in the same month, when I could send telegrams the other way collect, and have since received telegrams from these stations; and I have this objection from a Western Union standpoint, and as a shipper of cotton and anything I have to sell—have shipped

some grain in the last year—I find it very hard to get cars there because of no operator; it is hard to get cars without an operator, because they wire for cars, and it is also hard to have your cars picked up, because it is the custom for the agent to wire the dispatcher to wire the conductor on these trains to pick up certain cars. Q. You mean through trains? A. No, the local picks them up. They wire the local crew to pick them up; that is the custom, and I find it very inconvenient in that way. And as for the citizens, it is very hard to get messages. This last month I know that there were at least three messages that were never delivered; couldn't get them delivered because they were misunderstood; they couldn't be delivered; one was very badly misunderstood, and they never sent it at all until I happened down there, a few days after, and discovered that it had never been sent, and that was very inconvenient, and the season coming on and good prospects for a good cotton crop, anywhere from a thousand to fifteen hundred bales to be ginned, and the prospect of cotton buyers being there, and I myself expect to ship out all I gin. I didn't do that last year, because I had a hired man there, but I will attend to it myself this year. Mr. McAlester, Associate Member of the Commission: Q. You have a gin there? A. Yes, sir. Q. Any elevators there for grain? A. No, sir, no elevators; we have a mill, but no elevators. Assistant Attorney General: Q. You know about how many car loads of products were shipped from that station last year? A. No, sir, I don't know. I don't think there was any great lot of stuff shipped out. I ship in a car load of flour every six weeks—about the amount I receive there. Q. You ship your cotton out in less than car load lots at a time, or do you? A. Ship it out from twenty-five and fifty to a hundred bales at a time; never ship less than twenty-five."

Cross-examination by council for appellant:

"Q. Now, you were talking about having eight dollars worth of telegraph business—what month was that? A. Month of May. Q. Month of May, this year? A. Yes, sir. Q. Now you do your telegraphing in to Sparks by 'phone? A. Well, not altogether, sometimes we can't get them to answer. Q Sometimes you take it to Meeker? A. Well, we had our agent to send the money down there by train. Q. So you take it to Chandler? A. Yes, sir; I have a brother there, and he guarantees it for me. Q. Now, do you know when the telegraph service was discontinued at Payson? A. I think your record there that you claim February, 1908, is about correct. Q. I would like to request to ask him if he knows

what the receipts from the telegraph business at the station of Payson were for each month for 24 months prior to the time the service was discontinued? Mr. Love, Chairman: Not allowed by the court, from the fact that, when a public service corporation has certain monopolies and certain privileges other than private persons, they must give such service to the public as is reasonable service for the public. (Exceptions taken by counsel for appellant.) Witness: In order to meet competition in business from the city and community, while our town is in the neighborhood of 200 to 250 people, we don't do our business with the town; we do our cotton business principally with the country. Our country is thickly settled; there is two families to every quarter section who raise cotton and want to sell it, and, in order to meet competition and settle the demands of the people, it is necessary for me to maintain a market as good as at other points, and I claim that with the service that we are now furnished, without telegraph, that we are discriminated against, and therefore can't meet competition. Counsel for appellant: Q. If you had a gin located five miles from Payson without a telegraph wire running into it, you would have the same discrimination against you, wouldn't you? A. Without a telegraph station? Q. Yes, sir. A. Depends on how far it would be; it might be right close to a telegraph station and still be five miles from there. Q. If you had a gin three miles out of Payson towards Sparks, would you expect the telegraph company to put their wire in there and furnish an operator and furnish telegraph service, because your gin would have no other way of finding out things that some other gin knew? A. No, sir, I wouldn't, because there wouldn't be any station established there, and there was one already established at Payson and a market been established for cotton, and the people have been selling cotton there, and have been having as good a market there as at other points, therefore would expect the same, and I would expect better facilities from the railroad company at Payson than at these other points where no station had been established. Q. Therefore, you think that a telegraph office and a telegraph station ought to be kept there regardless of what the revenue is or what the expense is? A. No, sir, it paid them in the past, and it should at this time. Q. From the fact that one was kept there one, two or three years at a great loss, you think they ought to keep up the loss? A. No, sir, I think the town is growing, and the fact that you want to establish what the business was in the past would be no evidence, because Oklahoma towns don't stand still, and the business has

increased, and what it was once does not indicate what it will be in the future. Assistant Attorney General: Q. What you mean by discrimination, was a discrimination in favor of one community against another community, as provided in the Constitution shall not be done? A. Yes, sir, that is what I had reference to."

W. K. Etter, a witness for appellant, testified as follows:

"Counsel for Appellant: Q. What is your business? A. ·Superintendent of the Oklahoma Division of the A., T. & S. F. Railway. Q. As superintendent, do you have control over the lines from an operating standpoint at Payson, in Lincoln county, Okla.? A. Yes, sir. Q. I will ask you, Mr. Etter, if the Santa Fe Railway Company, defendant herein, is in any sense engaged in the commercial telegraph business? A. No, sir. Q. I will ask you if you have anything to do—if the railway has anything to do—with the establishment of commercial telegraph offices? A. No, sir, not to my knowledge. Q. Do you know how far north it is to where a commercial telegraph office is maintained from Payson? A. It is—my recollection is that it is 4 9-10 miles. Q. To what station? A. Sparks. Q. Is telegraph service maintained there? A. Yes, sir. Q. How far south from this station of Payson to where a commercial telegraph office is maintained? A. About six miles. Q. Is the commercial telegraph office open there during business hours for business? A. Yes, sir. Q. So that five miles one way and six miles the other from Payson there is maintained commercial telegraph offices to handle commercial business? A. Yes, sir. Q. Mr. Etter, have you taken, or have you informed yourself as to the amount of telegraph service performed in a commercial way at the town of Payson for each month of 24 months prior to the time this office was closed? Mr. Love, Chairman: Question objected to, for the reason that all public service corporations by having special rights, their first duty is to serve the public and the next is to make money, and whether they make money or not they must serve the public. (Exception taken by counsel for appellant.) Mr. Frank: Q. Does the Western Union continue telegraph service at a railway station after the Santa Fe Railway Company has withdrawn their service? Mr. Etter: I don't know whether they do or not. Mr. Frank: Is the distance from Payson to Sparks of 4 9-10 miles by rail or road? Mr. Etter: A. By rail. Mr. Cottingham: Q. State the reason to the Commission here, if you know, why the service was discontinued at Payson station? Mr. Love, Chairman: You need not answer that. (Exception taken by counsel for appellant.)"

Cross-examination by Assistant Attorney General:

"Q. Who discontinued the service—you or the Western Union? A. I closed the railroad telegraph office. Assistant Attorney General: I want to introduce a copy of the contract on file with the Commission, showing that the telegraph lines of the Santa Fe are jointly owned by the railway company and the telegraph company. (The record does not show however, that any copy of such contract was ever introduced.) Mr. Parnell: Q. There is one other question, and that is to the effect when the operator or agent at Payson received an order for a car set out at that place and was to wire it, if he had that privilege to do that? Mr. Love, Chairman: You have a law on ordering cars. If you haven't a copy of it, we can furnish you with that. That obviates that trouble, and whenever they violate that law, which this Commission made here, then you can make a complaint. Mr. Frank: The agent at Payson can't furnish cars on as short notice from the time they are ordered by the shipper as Sparks and Meeker, which are telegraph stations. Mr. Love, Chairman: You have a demurrage order to go by; it wouldn't cut any figure. You will be furnished with a copy of that law made by the Commission."

The foregoing comprises all the evidence upon which said order was made.

Thereafter, on the 31st day of August, A. D. 1908, the Commission entered its final order, the body of which is in words and figures as follows:

"On the 13th day of April, 1908, the complainants filed a petition with this Commission, alleging that telegraph service had been discontinued at the town of Payson, and alleging great inconvenience by reason thereof, and praying that the Commission require the defendant to reinstate such service.

"The case was heard August 17, 1908, and, after examination of several witnesses and due consideration of the evidence, the Commission finds that Payson is a town of some two hundred people or more, situated in a good agricultural community, and that it is from six to eight miles to other telegraph stations; that the defendant maintained telegraph service at this station for a number of years, and discontinued the same during the month of February, 1908.

"It is shown by the evidence that this was a cotton market, and that the various farm products were shipped from there, as is

customary in a community of this kind; and it is further shown by the evidence that the defendant furnished telegraph service to other communities similarly situated, and the Commission is of the opinion that the defendant should re-establish telegraph service, for commercial and other purposes, and for the purpose of bulletining the arrival of its trains, as required by the Commission's order No. 4.

"It is therefore ordered by the Commission that the defendant, the Atchison, Topeka & Santa Fe Railway Company, establish telegraph service at the town of Payson for such purposes as such service is commonly used by the public. That said service shall be established by September 15, 1908."

The following assignments of error were made by appellant.

(1)   That said Corporation Commission erred in holding that it had jurisdiction to hear and determine the questions involved. in said complaint and make an order therein.

(2)   That the order made by said Commission is unreasonable, unnecessary, and requires the performance by this plaintiff in error of a service in which it is not engaged, in that it requires it to maintain a telegraph service for commercial purposes, and it thereby imposes an obligation upon it outside of its line of business and not authorized by law.

(3)   That the Commission erred in excluding and refusing to consider any evidence whatever of the amount realized from telegraphic business in the town of Payson for the 12 months prior to the date of the complaint and for the 12 months immediately preceding the time when said service was discontinued.

(4)   That the Commission erred in making said order, in this: Because it is unreasonable, oppressive, and imposes a burden upon this plaintiff in error for which it receives no adequate compensation, and therefore amounts to the taking of its property without due process of law, within the purview of the fourteenth amendment to the Constitution of the United States.

(5)   That said Commission erred to the prejudice of this plaintiff in error in refusing to consider for any purpose whatever the cost of maintaining said station and the income therefrom, and in declaring through its chairman: "As was stated before,

we don't care anything about receipts or anything about that. We are going to eliminate that part of it."

(6)  That said order is erroneous, in that it is unreasonable, unnecessary, and unfair to this plaintiff in error, because there is not sufficient reason to justify the making of said order, or that would justify the maintaining of such service without regard to compensation.

(7)  That said order is without evidence to support it, and it is contrary to law.

(8)  That the Commission erred to the prejudice of the plaintiff in error in excluding the following evidence offered by the plaintiff in error for the purpose of showing that said telegraph station had been operated at a very great loss during the period of 12 months prior to its discontinuance, to wit:

"Mr. Cottingham, counsel for the appellant, propounded the following question to Mr. Parnell, one of the complainants in the cause:  Q.  Well, I have a record on it.  You know what the receipts from the telegraph business at this station were for the twelve months prior?  Mr. Love:  As was before stated, we don't care anything about receipts or anything about that.  We are going to eliminate that part of it.  Q. The telegraph service at that station, the business being discontinued, in February, 1908, do you know what the receipts were from telegraphic business for twelve months prior to the time when the service was discontinued?  Mr. Love: Question objected to.  Mr. Cottingham:  I would like to say the attorney for the Santa Fe now offers to prove what the receipts were at the station of Payson for the telegraphic business for each month during the period of twenty-four months immediately preceding the discontinuance of the service at that station.  Mr. Love:  It is not allowed by the court.  (Exception taken to ruling, by Mr. Cottingham.)  Mr. Love:  It has no bearing in a case of this nature, as all public service corporations by having a monopoly of certain special privileges take upon themselves obligations to serve the people first and then the making of money afterwards."

(9)  That said Commission erred in refusing to permit W. B. Frank to answer the following interrogations propounded to him by which the plaintiff in error was seeking to show that the com-

pensation realized from the operation of said office was wholly insufficient to support the expense thereof, to wit:

"Mr. Cottingham: I would like to ask to request him if he knows what the receipts from the telegraph business at the station of Payson were for each month for twenty-four months prior to the time the service was discontinued? Mr. Love: Not allowed by the court, from the fact that when a public service corporation has certain monopolies and certain privileges, other than private persons, they must give such service to the public as is reasonable service for the public. (Exception taken by Mr. Cottingham.)"

(10)    That said Commission erred in refusing to permit the witness W. K. Etter to answer certain questions showing the expense of maintaining said office and the income therefrom, which questions, answers, objection, and exception are as follows:

"Mr. Etter, have you taken or have you informed yourself as to the amount of telegraph service performed in a commercial way at the town of Payson for each month for twenty-four months prior to the time this office was closed? Mr. Love: Question objected to, for the reason that all public service corporations by having special rights, their first duty is to serve the public, and the next is to make money, and, whether they make money or not, they must serve the people. (Exception taken by Mr. Cottingham.)"

(11)    That said Commission further erred in refusing to permit W. K. Etter, the superintendent of the plaintiff in error, to testify why said station was discontinued; the offer of said evidence, and the exclusion of the same, and exceptions thereto being as follows:

"Mr. Cottingham: State reason to the Commission here, if you know, why the service was discontinued at Payson Station? Mr. Love: You need not answer that. (Exception taken by Mr. Cottingham.)"

(12)    That said order is wholly unreasonable, in this: That it was made by said Corporation Commission wholly from the standpoint of the evidence of the complainants, and in absolute disregard of the rights of the plaintiff in error, and upon a refusal to permit it to introduce any evidence going to show that said order would be unreasonable.

(13) That the said order deprives the plaintiff in error of its property without due process of law, in violation of the fourteenth amendment to the Constitution of the United States, and denies to this plaintiff in error the equal protection of the law guaranteed to it by the Constitution of the United States.

The appeal from said order is now properly before this court for determination.

*Cottingham & Bledsoe,* for appellant.—On admissibility and importance of evidence tending to show the earning capacity of a telegraph office ordered re-established, and the expense of maintaining same: *L. & A. Ry. Co. v. State* (Ark.) 106 S. W. 962; *A. C. L. R. Co. v. N. C. Corporation Commission,* 206 U. S. 20; *L. S., etc. Ry. Co. v. Smith,* 173 U. S. 690; *W. U. Tel. Co. v. Miss. Corporation Commission* (Miss.) 21 South. 16; *C., St. P., M. & O. Ry. Co. v. Becker et al.,* 35 Fed. 883; *Platt v. Lecocq,* 158 Fed. 723; *Ry. Commission v. K. C. S. Ry. Co.* (La.) 35 South. 480.

*Geo. A. Henshaw,* Asst. Atty. Gen., for the appellees, contended, *inter alia,* that a railway company may be required to furnish facilities, even though the particular facilities do not pay for the operation or maintenance of same—citing *Atlantic C. L. R. Co. v. North Car. Corporation Commission,* 206 U. S. 1.

WILLIAMS, J. (after stating the facts as above). The only party against whom the order appealed from runs, or was complained against, is the Atchison, Topeka & Santa Fe Railway Company. The undisputed proof shows that said railway company was not engaged in the telegraph business for commercial purposes, but only for the transacting of its business as a transportation company.

In the case of *People's Telephone Co. v. Eastern Railroad Co. of Minnesota et al.* (decided by the Railroad Commission of Wisconsin on October 12, A. D. 1908), the Commission in its opinion said:

"The only telephone facilities that must be furnished by a railroad are such as are necessary to a proper discharge of its duties as a common carrier. With the transaction of its own af-

fairs with its employes or others, when acting in its private capacity, the public is not concerned. In all such matters it possesses the same rights and enjoys the same privileges that are accorded to private corporations and individuals. The regulation of the public service of such a corporation does not extend to or include the management of its purely private affairs. The distinction between the acts of a public service corporation when acting in its public capacity, and those when acting in its private capacity, is often lost sight of, and as a result, not infrequently, erroneous conclusions are reached as to the scope of laws designed to regulate such corporations."

Following the rule laid down by the Wisconsin Commission, the only telegraph facilities that a railway company must furnish are such as are necessary to a proper discharge of its duties as a common carrier, for the moving of trains, etc.

Now, if it were to be insisted that it was necessary to maintain a telegraph station for the purpose of keeping the traveling public advised of the arrival and departure of trains, in determining whether or not such order would be just, reasonable, and correct, the passenger receipts from said station would be relevant. If it were further insisted that, on account of the car lots of freight shipped from said station, it was necessary to have such telegraph station maintained 'in order to have cars expeditiously furnished at said station, it would follow that the freight receipts from such shipments should be considered. Evidence on these points would be necessary to be introduced and considered in determining the reasonableness, justness, and correctness of such order. The order of the Commission does not, however, appear to have been based upon the theory that the telegraph office should be established as a facility for the transaction of the business of the transportation company, but as a telegraph office for the general use of the public. Nor does it appear to have been tried upon the theory of requiring the railway company to re-establish telegraph service as a facility in its transportation business. It follows that any order made requiring it to maintain a telegraph station for commercial purposes under the record is erroneous.

Had the Western Union Telegraph Company been made a

party to this proceeding, then the question would arise as to whether or not the receipts from that station, in connection with other proper matters for consideration, were sufficiently remunerative to justify the requiring of the maintaining of a telegraph station at that point for commercial purposes.

Whilst it is true that public service corporations may be required to render reasonable service for the public, yet that does not mean that the public must have service regardless of whether or not same may be at a loss to the public service corporation. In the case of *Western Union Telegraph Company v. Mississippi Railroad Commission,* 74 Miss. 80, 21 South. 16, in an opinion delivered by Chief Justice Cooper on May 18, 1896, it was held that:

"The following facts pleaded justified the company in discontinuing a telegraph office, to wit: That its lines were constructed and maintained and its business carried on in Mississippi at a great expense, while the receipts from its business were small and unremunerative; that a large majority of its offices in the state are maintained under agreement with various railroad companies whereby the railroad companies maintain the office and pay the operators, and but for this arrangement it would be unable to maintain its business in the state; that notwithstanding said contracts, and its earnest efforts to economize in every way consistent with efficient public service, for some time prior to the closing of said office, defendant was doing business in the state at a loss, owing to the competition with other lines, and owing to the tariff established by the Railroad Commission, and from other causes; that at Fayette it has no arrangement with the railroad company, and could make none; and that their receipts at that office, at the time it was closed, were insufficient to pay the expenses of keeping it open for business, and, if it was maintained, it would be at a loss to defendant, without its fault, and it could be maintained only at a loss to defendant in the expenditure of money and the consumption of its property, for which it could get no return. Wherefore, to require it to reopen the office would be violation of the Constitution of the state of Mississippi, in that it would be taking private property for public use without due compensation."

It is further pleaded that to require defendant to further keep open and maintain said office would be to deprive it of its proper-

ty without process of law, and violative of section 1 of the fourteenth amendment of the Constitution of the United States.

It may be that under certain circumstances it would be proper for the Commission to require the railway company to maintain a telegraph station at a certain point in the operation of its business as a transportation company where there would be no commercial business whatever. That question does not appear to have been seriously raised before the Commission. At any rate, in this case no such showing was made as would justify such an order requiring the maintenance of such station at Payson.

The evidence offered tending to prove the amount realized from the telegraphic business at the town of Payson for 24 months prior to the date of the complaint or the discontinuance of such service, to show that the telegraph station had been maintained at considerable loss during the period of 12 months prior to its discontinuance, and the expense of maintaining said office, was competent, and should have been admitted and considered by the Commission in connection with any other testimony introduced in determining whether or not it was reasonable, just, and correct to make such order against said appellant, had it been engaged in the transmission business. *Atlantic Coast Line v. North Carolina Corporation Commission*, 206 U. S. 26, 27 Sup. Ct. 585, 51 L. Ed. 933; *Home Ins. Co. v. Weide*, 11 Wall. 438, 20 L. Ed. 197; *Reagan v. Farmers' Loan & Trust Co.*, 154 U. S. 399, 14 Sup. Ct. 1047, 38 L. Ed. 1014; *Railroad Commission Cases*, 116 U. S. 307, 6 Sup. Ct. 334, 29 L. Ed. 636; *Lake Shore, etc., Ry. Co. v. Smith*, 173 U. S. 690, 19 Sup. Ct. 565, 43 L. Ed. 858; *L. & A. Ry. Co. v. State*, 85 Ark. 12, 106 S. W. 962; *Ward v. Young*, 42 Ark 554.

In that such cases are tried before the Corporation Commission and not before a jury, and the record should be preserved as in chancery or equity cases, it would be a more expeditious practice, when testimony is offered by either side, to permit the same to be introduced and made a part of the record, objections being noted, and the ruling of the Commission thereon, as to the admission or exclusion of the same, being preserved.

It follows that the order of the Corporation Commission appealed·from is reversed, with directions to proceed in accordance with this opinion.

All the Justices concur.