# WESTERN UNION TELEGRAPH CO. v. STATE.

No. 879.   Opinion Filed March 12, 1912,

(121 Pac. 1069.)

1.   **TELEGRAPHS AND TELEPHONES — Regulation — Jurisdiction of Corporation Commission.**  An objection that the Corporation Commission fixed rates without evidence to support the order does not run to the jurisdiction of the Commission to make the order, but to the reasonableness of the order when made.

2.   **CONSTITUTIONAL LAW—Due Process of Law—Equal Protection of Laws—Regulation of Telegraph Companies.**  A telegraph company is entitled to earn a fair return upon the present value of its property used in the business within the state; and where the Corporation Commission establishes rates that will not admit of such return as, under all the circumstances, is just, its order, establishing such rate, is in violation of the fourteenth amendment of the Constitution of the United States.

3.   **TELEGRAPHS AND TELEPHONES—Regulation—Determination of Reasonableness.**  The reasonableness or unreasonableness of rates prescribed by the Corporation Commission for the transmission of messages by a telegraph company within the limits of the state must be determined with reference only to the intrastate business done by the carrier, and to the profits derived from that business. It is by dividing the capital of the carrier invested in the business in proportion to the earnings of each that the amount of capital invested in intrastate business is found, and upon which the carrier is entitled to a fair return. And it is by dividing the total expense of conducting both its interstate and intrastate business on the same basis that the expense of conducting each is found. If the net profits derived from the intrastate business, further reduced by the application of the order, fail to yield a reasonable return on the investment, the order is unreasonable and unjust, and will be reversed.

4.   **COMMERCE—Subjects of Regulation—Charges by Telegraph Companies.**  An order of the Corporation Commission, which provides: "No extra charge shall be made for delivering a telegraphic message in cities or towns in this state within a radius of two miles from the office of the delivering telegraph company; provided that such point of final delivery is within the corporate limits of such town or city"—applies to incorporated towns and cities only, and is not an unconstitutional interference with interstate commerce, but a valid exercise of the power of the Corporation Commission, not only as to intrastate, but as to telegraphic messages from points without to points within the state.

5.    **TELEGRAPHS AND TELEPHONES** — Regulation — Reasonableness.    That part of the order which reads:    "No telegraph office where messages are received and transmitted for the public shall be discontinued or abolished without first obtaining the consent of ·the Commission, upon an application duly filed by the said company desiring such discontinuance, wherein shall be stated the reason therefor; it being understood that this refers to the main office, and does not include branches of the main office at any place"—is held to be unreasonable, and is modified, so as to require twenty days notice to the Corporation Commission of a proposed discontinuance.

(Syllabus by the Court.)

*Appeal from the State Corporation Commission.*

Appeal by the Western Union Telegraph Company to review an order by the Corporation Commission.    Modified.

*Cottingham & Bledsoe,* for appellant.

*Chas. West,* Atty. Gen., and *Chas. L. Moore,* Asst. Atty. Gen., for the State.

TURNER, C. J.    On March 24, 1908, the Corporation Commission, pursuant to article 9, sec. 18, of the Constitution, made due publication of proposed order No. 18, addressed "To all Telegraph Companies Doing Business in the State of Oklahoma." On July 14, 1908, the Western Union Telegraph Company filed its objections thereto.    After several hearings, consisting solely of the testimony of J. C. Nelson, superintendent of the appellant, the Commission, on December 1, 1908, issued a final order, which reads:

"CORPORATION COMMISSION OF OKLAHOMA
"Order No. 149.

"To all telegraph companies, persons, firms and corporations doing business in the state of Oklahoma, pursuant to publication of proposed order No. 18, relating to rates and regulations for telegraph service, in the Guthrie Daily Leader, a newspaper of general circulation, published in the city of Guthrie, county of Logan, state of Oklahoma, and said contemplated order having appeared therein once a week for four consecutive weeks, as required by law, and pursuant to regular hearing held in the Commission's office in the city of Guthrie, notice is hereby given that the following final order shall be in full force and effect on and after the

first day of January, 1909: No telegraph company or combination telegraph companies, doing business in the state of Oklahoma, shall charge or collect for the transmission of messages between points in the state of Oklahoma, a greater or different rate of charge than provided herein:

## "Rule No. 1.

"No telegraph company shall charge or collect more than the following scale of rates for any message of ten words, or less, exclusive of time filed, office check, date, time received, complete address and signature, between any points within this state on its lines: Scale of Rates.—175 miles and under, air line distance, day rate, 25c; night rate, 25c. 250 miles and over 175, air line distance, day rate 30c; night rate, 25c. Over 250 miles, air line distance, day rate, 35c; night rate, 25c. For each additional word over ten words, the day rate shall be two cents. For each additional word over ten words, the night rate shall be two cents.

## "Rule No. 2.

"All the telegraph companies are required to receive and transmit each other's messages, when necessary to reach a point of destination. Whenever a message is sent over two or more telegraph lines owned, controlled and operated by separate and distinct corporations, or individuals, the joint rate shall be ten (10) cents in addition to the single line rate named herein, of ten words or less, and one cent for each additional word over ten words: Provided, that the additional cost, or rate, shall not be charged when the same company has an office at the point of origin and destination.

## "Rule No. 3.

"All rates in force and effect on December 1, 1908, lower than the rates named herein shall remain in full force and effect until changed by order of the Commission.

## "Rule No. 4.

"The receiving clerk or receiving operator must give any aid or explanation necessary to enable the sender to prepare his or her message, and must also correctly mark on the face of the message the year, month, day, hour and minute that it is filed.

## "Rule No. 5.

"In sending a message, the sending operator must observe the following order of transmission: 1. The number of the message. 2. The operator's personal signal. 3. The correct and exact filing time as per rule 4. 4. The check of the message. 5. The place from. 6. The address of the message. 7. The body and signature of the message.

## "Rule No. 6.

"The receiving operator must show on the face of the message, the hour and minute the message was filed at point of origin, in addition to the hour and minute the message was received by him.

## "Rule No. 7.

"No extra charge shall be made for delivering a telegraphic message in cities or towns in this state within a radius of two miles from the office of the delivering telegraph company; provided that such point of final delivery is within the corporate limits of such town or city. Whenever practicable, such telegraph company may deliver all messages by telephone, with consent of the sender or addressee thereof, and charge the actual expense of so doing.

## "Rule No. 8.

"No telegraph office where messages are received and transmitted for the public shall be discontinued or abolished without first obtaining the consent of the Commission, upon an application duly filed by the said company desiring such discontinuance, wherein shall be stated the reason therefor; it being understood that this refers to the main office, and does not include branches of the main office at any place. Such branches may be opened or closed as the exigences of the business may require.

## "Rule No. 9.

"All rules and regulations of the telegraph companies operating in Oklahoma in force and effect on December 1, 1908, not changed by the rules and regulations herein prescribed, shall remain in full force and effect, until changed by order of the Commission.

## "Rule No. 10.

"A·copy of this order must be printed with twelve point type and shall be posted in some conspicuous place in each telegraph office in the state of Oklahoma for the information of the public. Two copies of tariffs, rules and regulations of each. telegraph company doing business in Oklahoma must be filed with the Commission by each company on or before the date this order becomes effective.

Assuming, as is contended, that there was no evidence before the Commission tending to prove that the existing rate was unreasonable, it does not follow that the Commission had no jurisdiction to fix the rate complained of. This for the reason that jurisdiction to fix the rates in the premises is vested in the Commission by article 9, sec. 18, *supra,* which reads:

"The Commission shall have the power and authority and be charged with the duty of supervising, regulating, and controlling all transportation and transmission companies doing business in this state, in all matters relating to the performance of their public duties and their charges therefor, and of correcting abuses and preventing unjust discrimination and extortion by such companies; and. to that end the Commission shall, from time to time, prescribe and enforce against such companies, in the manner hereinafter authorized, such rates, charges, classifications of traffic, and rules and regulations, and shall require them to establish and maintain all such public service, facilities, and conveniences as may be reasonable and just, which said rates, charges, classifications, rules, regulations, and requirements, the Commission may, from time to time, alter or amend. All rates, charges, classifications, rules, and regulations adopted, or acted upon, by any such . company, inconsistent with those prescribed by the Commission, within the scope of its authority, shall be unlawful and. void."

And the objection that it fixed rates without evidence to support the order would not run to the ·jurisdiction of the Commission to make the order, but to the reasonableness and justice of the order when made. ·Assailing the order, appellant contends that the rates therein prescribed are unreasonable, in that the same, if put in force, would fail to yield a fair return upon the present value of its property, used in the business within this state. That appellant is entitled to such return upon its investment goes

without saying. *Pioneer Telegraph & Tel. Co. v. Westenhaver et al.*, 29 Okla. 429, 118 Pac. 354.

In *A., T. & S. F. Ry. Co. v. State*, 23 Okla. 231, 100 Pac. 16, we said:

"Whilst it is true that public service corporations may be required to render reasonable service for the public, yet that does not mean that the public must have service, regardless of whether or not the same may be at a loss to the public service corporations."

In *Smythe v. Ames*, 169 U. S. 526, 18 Sup. Ct. 426, 42 L. Ed. 819, it is said:

"A state enactment, or regulation made under the authority of a state enactment, establishing rates for the transportation of persons or property by railroads, that will not admit of the carrier earning such compensation as, under all the circumstances, is just to it and to the public, would deprive such carrier of its property without due process of law, and deny to it the equal protection of the laws, and would therefore be repugnant to the fourteenth amendment of the Constitution of the United States."

In Beale & Wyman on Railroad Rate Regulation, sec. 406, it is said:

"According to modern views upon the constitutional guaranties, an adequate return upon the true value of the property devoted to the public use by those who conduct a public service ought, in all normal cases, to be left; otherwise it is conceded that they are in effect deprived of their property without due process of law, if their rates are so reduced by public authority as to leave no such adequate return. And this is based upon sound public policy. It ought always to be plain that those who invest their funds in some public employment are going to get a fair per cent. upon their investment, because, unless they are assured of this, they will employ their money elsewhere, and many enterprises necessary for the public convenience will not be undertaken; nor will existing plants be extended. It is, then, not only due consideration for the rights of others who have already invested their money in public service companies, but also an enlightened selfishness, with a view to the future, which dictates the policy that a reasonable return upon the value of the property used in the public service shall be held to be protected by the Constitution."

In the Westenhaver case, *supra*, we said:

"The rule generally established by the courts, including the Supreme Court of the United States, for determining the validity

of legislative acts, or of orders of boards or commissions, pre-
scribing rates, is that the act is valid, unless the rates be unrea-
sonable to the extent that their enforcement would be equivalent
to the taking of property for public use, without such compensa-
tion as, under the circumstances, is just to the owner and to the
public. The rate is fair, when its application will yield a fair re-
turn upon the reasonable value of the property at the time it is
being used for the public. It is unfair, when it does not yield such
return. *Knoxville v. Knoxville Water Co.*, 212 U. S. 1, 29 Sup.
Ct. 148, 53 L. Ed. 371; *San Diego Land & Town Co. v. Jasper*,
189 U. S. 439, 23 Sup. Ct. 571, 47 L. Ed. 892; *San Diego Land &
Town Co. v. National City*, 174 U. S. 739, 19 Sup. Ct. 804, 43 L.
Ed. 1154; *Smythe v. Ames*, 169 U. S. 466, 18 Sup. Ct. 418, 42
L. Ed. 819."

There is no dispute as to the facts and figures. Appellant's
lines are along the right of way of every railroad in the state and
consisted of:

| | |
|---|---:|
| 4,543.46 miles of poles at $40 | $181,738.40 |
| 15,846.91 miles of iron wire at $10 | 158,469.10 |
| 2,008.75 miles of copper wire at $20 | 40,175.00 |
| Miscellaneous | 1,151.60 |

—and were, on January 1, 1908, of a total physical valuation of
$381,554.10. Its gross earnings credited to Oklahoma for the
year ending June 30, 1907, were from three sources, to wit:

| | |
|---|---:|
| Intrastate | $ 31,525.49 |
| interstate and transstate | 152,039.93 |
| Miscellaneous, such as leased wire, etc. | 17,530.70 |
| In all | $201,116.12 |

Its gross expenses for that time were:

| | |
|---|---:|
| Managers, operators, clerks, messengers, and other employes | $ 87,887.54 |
| Rent, light, and fuel | 8,990.25 |
| Battery maintenance, instruments, and other supplies | 16,234.95 |
| Maintenance and repairs of lines | 12,544.18 |
| Reconstruction of lines | 26,984.77 |
| Railroad companies' proportion of net receipts | 9,552.45 |
| Executive and legal expenses and superintendence | 16,449.79 |
| Texas (Oklahoma Territory) | 6,844.32 |
| Other miscellaneous expenses | 7,495.12 |
| Total | $192,983.37 |

Showing its net earnings for that time, including interstate,
intrastate and transstate, to be $8,132.75, and its sole return upon
an investment of $381,554.10, or less than 3 per cent. It is in-
sisted by appellant that, as the estimated effect of the enforcement

of the rate would still further reduce its net earnings, the order is clearly unreasonable, and should be reversed. The answer made to this contention is that the item of "Railroad Companies' proportion of net receipts, $9,552.45" should not be charged as an item of gross expense, but as an item of "net receipts," which, when added thereto, would make the net receipts of appellant, instead of $8,132.75, $17,685.20. To this it is enough to say that this is contrary to the findings of the Commission, which, in making up the items of gross expense comprising the total of $192,-983.37, claimed by appellant, allowed said amount of $9,552.45 as an item of proper charge to the gross expense account. This was permitted by the state to go unchallenged before the Commission; but the Attorney General insisted in open court, on the argument, that it should not be allowed, and the court thereupon offered to remand the case to afford the state an opportunity to show the error. This offer was impliedly declined by the Attorney General, and, being supported by the evidence, the item will not be disturbed. Besides, it appears from the undisputed testimony that this sum was actually paid by appellant, pursuant to a working contract with certain railroad companies for certain privileges almost indispensable to the prosecution of the business of the appellant, without which, as found by the Commission, "the telegraph company could maintain offices and agents only at comparatively few stations within Oklahoma."

But the real question here is whether the Oklahoma rates— that is, the intrastate rate sought to be displaced by the order complained of, less all expenses properly chargeable against the same—yield a reasonable return upon the investment. If they do not, the order reducing them is unreasonable. If the interstate rates are too high, Congress alone has jurisdiction to interfere and correct them. We take it that the same rule applies here as applies in the fixing of freight rates. In *Smythe v. Ames, supra,* in the syllabus, it is said:

"The reasonableness or unreasonableness of rates prescribed by a state for the transportation of persons and property wholly within its limits must be determined without reference to the interstate business done by the carrier, or to the profits derived from that business. The state cannot justify unreasonably low

rates for domestic transportation, considered alone, upon the ground that the carrier is earning large profits on its interstate business, over which, so· far as rates are concerned, the state has no· control; nor can the carrier justify unreasonably high rates on domestic business, upon the ground that it will be able only in that way to meet losses on its interstate business."

To ascertain whether the intrastate rate sought to be installed would yield a fair return upon the capital investment, Justice Brewer, in *Ames v. Union Pac. Ry. Co.* (C. C.) 64 Fed. at page 179, lays down the rule thus:

"We have an attempt by the Legislature to prescribe a maximum tariff for only the transportation of freight within the limits of Nebraska, and are called upon to determine whether the rates so fixed are unreasonable, and afford no fair compensation to those who have invested their means in these railroad properties. In order to determine this, we must ascertain what it costs to carry this local freight, what the receipts have been therefrom, and what reduction will be made in such receipts by the application of this act, and then we must take such proportion of the gross investment in the road as the present earnings from the local freight bear to the total earnings of the road. From these computations, we may see whether the reduction made by this act in the local freight, if applied to all the company's business, would leave any compensation to the owners, and, if so, how much."

In applying this rule, it is sufficient to say, as contended (and the contention is unchallenged), that, dividing the capital of appellant invested in the state ($381,554.10) between its intra- and its interstate business in proportion to the earnings of each, we find that about 24.4 per cent. thereof, or $93,099.20, is used in conducting its intrastate business, and upon which appellant is entitled to a fair return; that, dividing $192,983.37, or the total expense of conducting both its intra- and interstate business on the same basis, $47,087.76 thereof should be borne by the former. This amount, deducted from $49,076.19, the total income from intrastate business from all sources, leaves the net income derived from this source for the fiscal year ending June 30, 1907 (the latest data available), $1,988.43, which, less $3,250, the reduction incident to the enforcement of the order complained of, would require appellant to conduct its intrastate business at a

loss. We are therefore of opinion that the rates sought to be put in force are unreasonable, and the order, to that extent, should be reversed; and, inasmuch as the return of $1,933.43 is but little in excess of 2 per cent. on the investment of $92,526.74, used by appellant in conducting its intrastate business, that the rate sought to be displaced should stand.

To the contention of appellant that it has a right to operate under its own rules, which, when fixed, are presumptively right and reasonable, and that upon him who assails them lies the burden to prove the same to be unfair, we will not speak, except to say that the record discloses no rules of appellant which the remainder of the order seeks to displace; and that all remaining for us to consider is whether appellant has fairly overcome the presumption attaching thereto that the same is *prima facie* just, reasonable, and correct. That it has so fairly overcome said order as to all of so-called "Rule 2," except that part requiring telegraph companies to transmit each other's messages when necessary to reach a point of destination, is conceded.

It is next contended that the Commission was without jurisdiction to make that part of the order complained of, known as "Rule 7," which reads, "No extra charge shall be made for delivering a telegraphic message in cities or towns in this state within a radius of two miles from the office of the delivering telegraph company, provided that such point of final delivery is within the corporate limits of such town or city," for the reason that the same is an interference with interstate commerce. The effect of that part of the order is to establish a free delivery limit, and applies alike to interstate, intrastate, and government messages. As the transmission of telegrams between states is interstate commerce, and an interference with their delivery an interference with that commerce, it is for us to determine whether that part of the order is such an interference as to bring it in conflict with the commerce clause of the Constitution.

In *Telegraph Co. v. Tex.*, 105 U. S. at page 464 (26 L. Ed. 1067), the court said:

"In *Pensacola Telegraph Co. v. Western Union Telegraph Co.*, 96 U. S. 1 [24 L. Ed. 708], this court held that the tele-

graph was an instrument of commerce, and that telegraphic companies were subject to the regulating power of Congress in respect to their foreign and interstate business. A telegraph company occupies the same relation to commerce as a carrier of messages that a railroad company does as a carrier of goods. Both companies are instruments of commerce, and their business is commerce itself. They do their transportation in different ways, and their liabilities are in some respects different, but they are both indispensable to those engaged to any considerable extent in commercial pursuits. Congress, to facilitate the erection of telegraph lines, has by statute authorized the use of the public domain and the military post roads, and the crossing of the navigable streams and waters of the United States for that purpose. As a return for this privilege, those who avail themselves of it are bound to give the United States precedence in the use of their lines for public business, at rates to be fixed by the Postmaster General. Thus, as to government business, companies of this class become government agencies. The Western Union Telegraph Company having accepted the restrictions and obligations of this provision by Congress, occupies in Texas the position of an instrument of foreign and interstate commerce, and of a government agent for the transmission of messages on public business."

When a state, by statute, imposes a restriction on interstate telegraphic messages such statutes are void.

In *Wabash, etc., Co. v. Illinois*, 118 U. S. 557, 7 Sup. Ct. 4, 30 L. Ed. 244, the syllabus says:

" * * * That a statute of a state, intended to regulate or to tax or to impose any other restriction upon the transmission of persons or property or telegraphic messages from one state to another, is not within that class of legislation which the states may enact in the absence of legislation by Congress; and that such statutes are void, even as to that part of such transmission which may be within the state."

In *Butner v. Western Union Telegraph Co.*, 2 Okla. 234, 37 Pac. 1087, in the syllabus, it is said:

"An act of the territorial Legislature, which regulates the order of receipt and transmission of telegraphic messages, and prescribes a penalty for its violation, but which does not attempt to regulate the delivery of messages outside the territory, or of messages sent from without the territory, is not in conflict with the constitutional provision giving to Congress the right to regulate commerce between the states and territories."

—Clearly implying that any regulation of the delivery of messages by the state, sent from without the state, which hampers the delivery is in conflict with that part of the Constitution. In other words, the test is whether the proposed order is promotive or obstructive of the duty of the appellant, as a telegraph company, with reference to messages sought to be delivered. If it is a mere regulation of the delivery of its messages, and promotive thereof, it is not in conflict; but if it amounts to more than a mere regulation, and to an obstruction of such delivery, it is in conflict with the Constitution.

In *Western Union Tel. Co. v. James,* 162 U. S. 651, 16 Sup. Ct. 934, 40 L. Ed. 1105, the state of Georgia passed a statute, prescribing a penalty in a sum certain against telegraph companies failing to transmit and deliver dispatches with due diligence. Pursuant thereto, a merchant in that state brought suit against the telegraph company to recover a penalty for its failure to deliver, to his damage, a message addressed to him by a merchant in Alabama. The only question before the court was whether the statute was a valid exercise of power by the state over telegrams from points without to points within the state. After holding that it was not an unconstitutional interference with interstate commerce, as applied to such message, in the absence of any legislation by Congress upon the subject, the court said:

"In one sense, it affects the transmission of interstate messages, because such transmission is not completed until the message is delivered to the person to whom it is addressed, or reasonable diligence employed to deliver it. But the statute can be fully carried out and obeyed without in any manner affecting the conduct of the company with regard to the performance of its duties in other states. It would not unfavorably affect or embarrass it in the course of its employment; and hence, until Congress speaks upon the subject, it would seem that such a statute must be valid. It is the duty of a telegraph company which receives a message for transmission, directed to an individual at one of its stations, to deliver that message to the person to whom it is addressed, with reasonable diligence and in good faith. That is a part of its contract, implied by taking the message and receiving payment therefor. The statute in ques-

tion is of a nature that is in aid of the performance of a duty of the company that would exist, in the absence of any such statute; and it is in no wise obstructive of its duty as a telegraph company. It imposes a penalty for the purpose of enforcing this general duty of the company. The direction that the delivery of the message shall be made with impartiality, and in good faith and with due diligence, is not an addition to the duty which it would owe, in the absence of such a statute. Can it be said that the imposition of a penalty for the violation of a duty which the company owed by the general law of the land is a regulation of or an obstruction to interstate commerce, within the meaning of that clause of the federal Constitution under discussion? We think not. No tax is laid upon any interstate message; nor is there any regulation of a nature calculated to at all embarrass, obstruct, or impede the company in the full and fair performance of its duty as an interstate sender of messages. We see no reason to fear any weakening of the protection of the constitutional provision, as to commerce among the several states, by holding that, in regard to such a message as the one in question, although it comes from a place without the state, it is yet under the jurisdiction of the state where it is to be delivered (after its arrival therein at the place of delivery), at least so far as legislation of the state tends to enforce the performance of duty owed by the company under the general law. So long as Congress is silent upon the subject, we think it is within the power of the state government to enact legislation of the nature of this Georgia statute."

If the proposed order establishing a free delivery zone added anything to the burden of delivering messages, or anything to the duties of appellant under the law in connection therewith, we might see how it might be thus objectionable; but it does not. Prior to and unaffected by the order, in the absence of an understanding or agreement to the contrary, the extent of the contract of appellant was the prompt transmission and a diligent effort to deliver the message in the city or town to which the message was sent. *Telegraph Co. v. Harvel*, 67 Kan. 729, 74 Pac. 250. The law fixed no limit for free delivery, except that fixed by the limit of the city or town. The telegraph company might, however, make reasonable rules establishing such limit, after which, in the absence of a custom, or agreement (2 Joyce on Electric Law, sec. 767a), the company could not be required to

deliver a telegram beyond those limits, without an additional charge. Now, as that part of the order complained of does not undertake to extend the free delivery zone beyond the point fixed by the law as theretofore existing—that is, the limits of the city or town—but, in fact, contracts it to within two miles of the office of the delivering company in all such wherein the corporate limits extend beyond that distance, we are of opinion that, instead of adding to, it takes from the burden of delivering the message, by impliedly acknowledging the right of appellant, and making it permissible, to charge an additional fee for so doing, when messages are delivered by it beyond the zone. This would add nothing to its duties within the zone, under the law as theretofore existing, and would stimulate appellant in the performance of its duty to deliver messages beyond the zone.

In *Western Union Tel. Co. v. Com. Mill. Co.,* 218 U. S. 406, 31 Sup. Ct. 59, 54 L. Ed. 1088, in the syllabus, it is said:

"While a state statute which imposes positive duties and regulates the performance of business of a telegraph company is void as a direct regulation of interstate commerce, as decided in *Western Union Tel. Co. v. Pendleton,* 122 U. S. 347 [7 Sup. Ct. 1126, 30 L. Ed. 1187], a statute which imposes no additional duty, but gives sanction only to an inherent duty, and declares, as to a public service, the public policy of the state, does not entail any burden on interstate commerce, and is not void under the commerce clause of the Constitution of the United States."

See, also, *Western Union Tel. Co. v. Crovo et al.,* 220 U. S. 364, 31 Sup. Ct. 399, 55 L. Ed. 498.

A close analogy lies between the duties of telegraph and express companies with reference to delivering. Wyman on Public Ser. Corp. (section 277) says:

"There are certain services in which a company undertakes delivery within a community. Express matter and telegraphic messages are prominent examples of this."

*U. S. Express Co. v. State,* 164 Ind. 196, 73 N. E. 101, was a suit to recover a penalty for failure to deliver an express package, by any such company doing business within the state of Indiana, to the consignee. The court said:

"It is argued that the act is so general as to amount to an attempt to regulate interstate commerce; and that therefore the

enactment is void as a whole. As a proper preliminary to a discussion of the principal proposition thus asserted, we shall consider the duty of a carrier by express, in the absence of any statute, laying aside all question as to the delivery of goods by express at small stations, and also the question of usage as affecting the carrier's obligation, neither of which is an element in the case before us. It may be said that it is the duty of a carrier by express to deliver packages received by it to the consignee at his residence or place of business. [Citing authorities.] * * * Having ascertained that the purpose of the statute is merely to require the carrier, under the compulsion of a penalty, to observe its general duty, the question confronts us as to whether the enactment is such an attempted interference with interstate commerce as to make the act void."

And, after quoting *Western Union Tel. Co. v. James, supra,* as we have done, said:

"It is our conclusion, so far as concerns the objection that the statute is invalid as an attempted regulation of interstate commerce, that it is competent for the state to require carriers of express, under a penalty, to live up to their obligations under the general law, in respect to the delivery of packages in this state; and that therefore the objection is not well taken."

We are therefore of opinion that, far from hampering, the effect of the order is in the interest of good service, "tends to enforce the performance of the duty owed by the company under the general laws," and must stand, unless otherwise successfully assailed.

Assailing the reasonableness of that part of the order, appellant contends:

"The record shows that 33 1-3 per cent. of the stations of the appellant in this state yield a gross monthly revenue of not more than $5, and twenty per cent. of these offices yield not more than $2 a month gross revenue. At all such stations, the appellant is able to furnish service to the people only by employing operators with most of their time devoted to other work. At many such stations, delivery of messages by messenger employed for that purpose is not attempted, and necessarily could not be. The revenue would not permit it."

Assuming such to be the state of the record, the order is not unreasonable. This for the reason that the record fails to disclose that the towns referred to are incorporated, and therefore

·included within the order. Believing, as we do, that the order means to establish a free delivery zone in incorporated cities and towns only, for a radius of two miles from the delivering office, should the corporate limits extend that far or further, and to the extent of those limits, if not so far, and to leave the rights of all parties in interest, in unincorporated towns, as they were under the general law, and unaffected by the order, we are of opinion that the part of the order thus assailed still bears the presumption of being *prima facie* just, reasonable, and correct, and must stand.

Assailing that part of the order, designated as "Rule 8," prohibiting the discontinuance of any main telegraph office at which messages are received and sent, without the consent of the Commission, obtained upon application duly filed by the company, it is contended that the record "disclosed that 88 per cent. of the offices of the Western Union Telegraph Company in Oklahoma have gross receipts of less than $50 per month, and about 33 per cent. have gross receipts of less than $5 per month, and about twenty per cent. have gross receipts of less than $2 per month; and that the company is unable to secure the service of an operator for less than $50 per month. It further appears from page 36 of the record that the business is much more active at a number of stations at certain seasons of the year than it is at other seasons; and that the company could afford to maintain telegraph service at a number of telegraph stations at certain seasons of the year when there is absolutely no· demand for such service at other seasons. It would certainly seem to be unreasonable and unjust to require the telegraph company to secure the permission of the Corporation Commission to discontinue an office, where the earnings are less than $2 per month, or even $5 per month." We think so too. And for the further reason that, as we have just held that appellant is, independent of the order, already conducting at a loss its intrastate business, as it says, hoping for better times, it would be unreasonable and unjust to enforce a rule, such as the one proposed, which would have the effect of forcing it, contrary to its better judgment, to continue to do business at an office beyond a certain time it had ceased to be

Opinion of the Court.

profitable, and until such time as consent of the Commission could be obtained, upon application to it. In view of the fact, however, that the discontinuance of a main office, without notice, might result in serious inconvenience to the public, that part of the order complained of is modified, so as to require twenty days' notice to the Commission of a proposed discontinuance, to the end that the best interests of all concerned may be subserved.

As there is nothing of merit in the remaining assignments of error, that part of order No. 149, designated as "Rule 1," prescribing a "scale of rates," and that part of said order, designated as "Rule 2," prescribing a joint rate for separate companies, is reversed and set aside. That part of said order, known as, "Rule 8," is modified as stated. The remainder of said order is affirmed.

HAYES, KANE, and DUNN, JJ., concur; WILLIAMS, J., concurs in the conclusion.

## On Rehearing.

PER CURIAM. The parties hereto have filed the following stipulation in this court, for the rendering of judgment in this cause, here set out. The judgment heretofore rendered in this cause is hereby modified, so as to conform to this stipulation.

### "Stipulation.

"It is stipulated by and between the appellant, the Western Union Telegraph Company, and the state of Oklahoma, that it was the intention of the Corporation Commission that all of the rates, rules, and regulations contained in order No. 149 of the Corporation Commission were intended to apply only to intrastate business, and in no wise to interstate business or interstate messages, or any service in connection therewith. It is further stipulated that it is the proper interpretation of said order to construe the same as applicable only to intrastate messages, and as not applying in any particular or in any event to interstate messages. Cottingham & Bledsoe, Attorneys for Western Union Telegraph Company. Chas. L. Moore, Assistant Attorney General, and Attorney for State of Oklahoma.

### "Precedent for Journal Entry.

"On this day came on to be heard the application of appel-

lant for a modification of the order of this court heretofore en-
tered in this cause, and also came on to be heard the stipulation
of counsel that it was the purpose and intention, in making said
order, that it should apply only to intrastate business both as to
rates and regulations.    It is therefore ordered that order No.
149 of the Corporation Commission of the state of Oklahoma be
modified, so as to read as follows:

"Rule No. 1.

"No telegraph company or combination of telegraph com-
panies doing business in the state of Oklahoma shall charge or
collect for the transmission of messages between places within
the state a greater charge than was made by such company or
companies for such service on the 1st day of January, 1912, with-
out further order of the Corporation Commission.

"Rule No. 2.

"The receiving clerk or receiving operator must give such
aid or explanation as may be necessary to enable a sender to pre-
pare his or her message, and must correctly mark on the face
of the message the year, month, day, hour, and minute that such
message was filed for transmission.

"Rule No. 3.

"In sending a message, the sending operator must observe
the following order of transmission:  1.  The number of the mes-
sage.  2.  The operator's personal signal.  3.  The correct and
exact filing time as per rule 2.  4.  The check of the message.
5.  The place from.  6.  The address of the message.  7.  The
body and signature of the message.

"Rule No. 4.

"The receiving operator must show on the face of the mes-
sage the hour and minute the message was filed at point of origin,
in addition to the hour and minute the message was received
by him.

"Rule No. 5.

"No extra charge shall be made for delivering a telegraphic
message in incorporated cities or towns in this state within a
radius of two miles of the office of the delivering company, when
such point of final delivery is within the corporate limits of such
city or town.  Any telegraphic company may, with the consent of
the sender or addressee, and when practicable, deliver a message
by telephone, and may in such case charge the actual expense of
so doing.

"Rule No. 6.

"No independent or uptown telegraphic office where mes-
sages are received and transmitted for the public shall be dis-

continued or abolished without first giving the Commission 30 days' notice of the intention to abolish the same: Provided the Commission may authorize the discontinuance of an office at any time or upon shorter notice; and provided, further, that this rule shall not apply to offices maintained jointly by telegraph and railroad companies.

"Rule No. 7.

"All rules and regulations of telegraph companies operating in Oklahoma, in force and effect on the 1st day of January, 1912, not changed by the rules and regulations herein prescribed, shall remain in full force and effect until changed by the Commission.

"Rule No. 8.

"That the rates, rules, and regulations prescribed by this order shall apply only to messages moving between points within the state, and shall not be held or construed to apply in any particular to interstate messages.

"Rule No. 9.

"A copy of this order must be printed with twelve-point type and shall be posted in some conspicuous place in each telegraph office in the state of Oklahoma for the information of the public. Two copies of tariffs, rules, and regulations of each telegraph company doing business in Oklahoma must be filed with the Commission by each company on or before date this order becomes effective."

Order No. 149 of the Corporation Commission, as herein modified, shall become effective on the 10th day of April, 1912.