SAMUEL W. HAYES, CHIEF JUSTICE.
MATTHEW J. KANE, VICE CHIEF JUSTICE.
R. L. WILLIAMS,
JOHN B. TURNER,    }JUSTICES.
R. H. LOOFBOURROW,

*In re* INTRASTATE EXPRESS RATES.

No. 1272.    Opinion Filed October 7, 1913.

On Rehearing January 13, 1914.

(138 Pac. 382.)

1.    CARRIERS—Corporation Commission—Fixing of Rates—Validity
of Order—Review.    The Corporation Commission in fixing rates,
charges, classifications of traffic, and rules and regulations to be
observed on intrastate business by the express companies doing
business in this state, having heard evidence not only on the "ade-
quate return on investment" theory, wherein evidence was re-
ceived for the purpose of proving the value of the property devoted
to the public service in intrastate business and the revenue de-
rived therefrom and expenses thereon, and also on the "comparison
of rate" theory, and the great weight of evidence contained
in the record on the "comparison of rate" theory sustains the
order of the Commission, and that in the record on the "ade-
quate income" theory not being so satisfactory and conclusive
as to overcome the presumption that the order was prima facie
just and reasonable, as supported by the proof on the "compari-
son of rate" theory, held, that on review here the order of the
Commission will not be disturbed.

In re Intrastate Express Rates.

## On Rehearing.

2.    **CARRIERS — Corporation Commission—Order Fixing Rates—Review.** An order of the Corporation Commission fixing express rates will not be disturbed on review by the Supreme Court, where there was evidence before the Commission to sustain the order, and there is no evidence in the record to overcome and destroy such supporting evidence; the order of the Commission being considered on review as **prima facie** reasonable and just when sustained by any evidence.

(Syllabus by the Court.)

*Appeal from the State Corporation Commission.*

In the matter of the Intrastate Express Rates. Appeal from an order of the Corporation Commission. Modified and affirmed.

*Cottingham & Bledsoe, C. W. Stockton, Frank H. Platt, T. B. Harrison,* and *J. L. Minnis,* for appellants.

*Chas. West,* Atty. Gen., *Chas. L. Moore,* Asst. Atty. Gen., and *E. C. Patton,* for appellee.

WILLIAMS, J. On June 11, 1909, the Corporation Commission made an order to become effective on August 1, 1909, directed to the Wells Fargo & Co., Adams Express Company, Pacific Express Company, and United States Express Company, prescribing certain rules, regulations, classifications, and rates to be observed and charged by said companies within the state. Prior to the entering of said order, notice had been given and appearance made and various objections interposed against the same.

On December 13, 1909, the supersedeas was granted by the Corporation Commission, and on the same date the appeal of appellants from said order was commenced in this court. On December 30, 1909, leave was obtained to have certain portions of the record printed. On May 12, 1910, such printed records were filed in this court, and the appellants allowed 60 days in which to prepare and file briefs, and the appellee 60 days to prepare and file briefs after the expiration of the time granted to appellants. Appellants filed a motion to have the cause remanded to the Commission for further hearing. The motion not being resisted by the Attorney General, the same was sus-

tained. On October 25, 1911, the cause was set for hearing in this court. On October 26, 1911, the cause not being properly at ·issue, the same was stricken from the regular assignment. On December 19, 1911, additional time was allowed both the appellants and the appellee in which to file briefs. On December 29, 1911, additional evidence taken before the Corporation Commission was filed in this court. On March 13, 1913, the cause was set for submission. On April 8, 1913, the cause was argued orally and submitted. On May 13, 1913, the cause was again remanded to the Corporation Commission, in order that certain tables of rates in force in other states might be incorporated in the record. On May 31, 1913, additional evidence, including the said tables of rates in force in other state, as certified by the Commission, were filed in this court. The appeal is now properly before us for final determination.

On July 26, 1911, the Corporation Commission, after said cause had been remanded ·to it for further hearing, made additional findings of fact and recommendations, said order being *in haec verba:*

"Order No. 553. Proposed Order No. 40. *In re* Proposed Order to All Express Companies Doing Business in Oklahoma, to Establish Express Rates. Findings of Fact and Recommendations. Rehearing.

"This case was remanded by the Supreme Court with instructions to the Commission to take additional evidence and ascertain by actual operations of the express companies the percentage of reduction caused by the rate promulgated by the Commission as compared with the rates now in force by the express companies in Oklahoma. Also to take such additional evidence as may be pertinent. The last requirement of the court was so general that, in order to comply with the same, the express companies were given opportunity to introduce any additional testimony they deemed proper.

"After various consultations as to a time when the express officials could come from New York, the case was finally set for hearing and again continued upon the inability of the express officials to be present.

"Upon the hearing, the testimony of the express companies was based upon reports made to the Commission, which purported to show the rates actually charged and the rates that would have been collected if the Commission's rates had been

in force, and from this each express company made their esti-
mate of the reduction imposed by the Commission's rates.

"Upon investigation of these reports, the Commission found
that they were wholly inaccurate. Some companies had filed the
reports of the forwarding agent, which contained so many over-
charges and irregularities that the percentage of reduction shown
by these reports was in excess of the actual reduction. It was
then agreed that an actual test should be made for one week in
October and one week in November by the United States Ex-
press Company, which is now doing a very large business in
Oklahoma. The test for November after it was completed and
ready for shipment was destroyed by fire in the office of the
company in New Jersey, hence we only have one week which
was compiled by the express company. This shows a reduction
of 23½ per cent. instead of from 27 to 30 per cent. as shown
by the evidence and exhibits introduced. The American Ex-
press Company, which formerly charged the highest local rate,
and the United States Express Company filed exhibits, which
purport to show a loss would have been sustained had their busi-
ness been done on the rate the Commission prescribed. We need
consider these exhibits no further than to explain the basis upon
which the calculations were made.

"Exhibit 1, rehearing, filed by the American Express Com-
pany shows gross state earnings $83,585.67, which is 15 per
cent. of the total earnings on state and interstate business in
Oklahoma. Earnings on interstate business apportioned to Ok-
lahoma $437,289.98, or 84.99 per cent. of the total business both
state and interstate. They find that the total terminal expense
accruing within the state of Oklahoma, both state and interstate
according to this exhibit, was $76,970.52. The terminal expense
accruing to the interstate business outside of Oklahoma was
$84,295.11. Each interstate transaction has two terminal ex-
penses; one within the state and one without. The terminal ex-
pense out of Oklahoma was, according to this exhibit, $7,324.59
more than both the terminal expense on the same business in
Oklahoma and of the terminal expense on the state business.
They find that the terminal expense on all business outside of
Oklahoma, both state and interstate, as there is no segregation
made in their books between interstate business and the local
business in other states, was 29.43 per cent. From this per cent.
they deduct 11.87 per cent., which is termed the ratio of terminal
expense in Oklahoma, which leaves 17.56 per cent., which they
say is the ratio of terminal expenses to gross proceeds outside of
Oklahoma. which is ascertained by taking 15.56 per cent. of

$480,041.51. This was the process by which they found that the terminal expense outside of Oklahoma was $7,324.59 more than both the state and interstate terminal expense within Oklahoma.

"They then add the terminal expense in Oklahoma, both state and interstate, which was $76,970.52, to what they find to be the terminal expense outside of Oklahoma, $84,295.11, makes a total terminal expense on all business done which had its origin or destination in Oklahoma, or both, or $161,265.63. They then find that the revenue accruing on Oklahoma state business was 15.01 per cent. of the total business. They find that Oklahoma should pay 15.01 per cent. of the total $161,265.63, which would make the terminal expense on Oklahoma business $24,205.97, $24,205.97 is 28.31 per cent. of the gross proceeds on Oklahoma state business. This process of evolution, by series of percentages by which they charge Oklahoma state business with 28.31 per cent. of the total gross business, is wholly unreliable and fallacious. Why should Oklahoma intrastate business be charged with outside terminal expense of interstate?

"In the former hearing of this case, terminal expenses were gone into very fully and are explained in the opinion of the Commission. At all commission offices where no wagon service is maintained, the agent receives 10 per cent. in and out, which would be equivalent to 20 per cent. of gross proceeds, including the salaried officers and commission officers. The total terminal expense in Oklahoma would average not to exceed 22 to 23 per cent. of the gross proceeds.

"The next item on the exhibit is general expenses. They ascertain the general expenses chargeable to Oklahoma by taking 16.81 per cent. of the gross revenue, which they find to be $14,251.19. They do not explain how they ascertain the 16.81 per cent. which they used to make this deduction. On page 49 of the annual report, under item No. 5, the general expense is 7.95 per cent. of the operating expense. This means all operating expenses less the amount paid the railroads.

"We will carry out the deductions according to the rule used by the courts in ascertaining the cost apportioned to each business on a revenue basis. In the exhibit they give the total interstate earnings $480,041.51. The business upon which this amount was collected only had one terminal in Oklahoma, that is, it either originated or was delivered in Oklahoma. The total earnings collected on Oklahoma business were $84,778.05. Business that earned this amount had two terminals in the state of Oklahoma. In order to put the state earnings on the same basis

as to terminals' expense as interstate earnings, it is necessary to double the state earnings, which would be when doubled $169,556.10. This added to the interstate earnings make a total of $649,597.61 on a basis of one terminal in the state, the state business is 26.1 per cent. of the total in the state. The total terminal expense in Oklahoma shown by this exhibit was $76,970.52. Twenty-six per cent. of this amount would give the terminal expense apportioned in Oklahoma, which is $20,089.30. The terminal expense cares for all expense incurred at the point of origin or destination, including office supplies and rents, the keeping of the horses in stables, wagons, and every expense whatever of this character. The other expenses in Oklahoma are not given the same as terminal expense, and to ascertain the same it is necessary to take the per cent. that the average expense of the entire system sustained to the gross revenue, as we have only the gross revenue and percentage of general expenses. The classification of expense accounts is divided into four: First, maintenance; second, traffic expense; third, transportation expenses; fourth, general expense. Each of the four heads is again divided into subaccounts, a copy of which will be transmitted with the record in this case.

"Under maintenance, other than what is already included in the terminal expense, should be transportation equipment, .14 per cent.; under traffic expense, superintendents, .69 per cent.; advertising, .13 per cent.; stationery and printing, .19 per cent.; under transportation, superintendents, 5.19 per cent.; train employees, 7.19 per cent.; train supplies, .29 per cent.; stationery and printing, 1.93 per cent.; loss and damage, 3.85 per cent.; damage to persons, .04 per cent.; injury to persons, .18 per cent.; general expense, 7.45 per cent. This makes a total of 27.27 per cent. of the total operating expense other than amount paid the railroads, or this is equivalent to 23½ per cent. of the gross revenue after deducting the amount paid for train privileges. The train privileges as shown in this exhibit amount to $41,774.60, which leaves $43,503.45 as gross revenue after train privileges are paid. 23.52 per cent. of this amount is equal to $10,233.01. Hence we have the following:

Gross revenue for the state of Oklahoma _____$84,778 05
Railroad transportation _____$41,274 60
Terminal expense _____ 20,089 30
All other expense _____ 10,233 01    71,596 91

Net revenue _____$13,181 14

"A complete discussion of this terminal expense will be found in the last column at the bottom of page 5 and continues

on the first column of page 6 of Commission's former opinion in this case, and the apportionment of the terminal expense above made verified the findings there referred to by the Interstate Commerce Commission.

"The amount of terminal expense apportioned to Oklahoma is about 23½ per cent. of the gross proceeds. The Commission's findings were from 22 to 24 per cent. of the gross proceeds. The amount of property owned in Oklahoma by the American Express Company according to its own statement is $17,334.81. This statement is found on page 63-A Annual Report, a copy of which will be transmitted with the record. If this property is to be divided upon the basis of the terminal expense in the state, the state should be charged with 26.1 per cent. of the same, which is $4,524.37. The net earnings as shown above, $13,181.14, are equivalent to 290 per cent. on the capital actually devoted to the Oklahoma business.

"The United States Express Company has filed an exhibit which is a copy of the report filed with the Corporation Commission with deductions made therefrom according to the ideas of the express company. A final summary of these deductions, which is shown in exhibit 1 on the last page of the exhibit, is as follows:

| | | |
|---|---|---|
| Total interstate earnings | | $267,147.63 |
| Amount paid railroads 55% | $146,931 20 | |
| Total terminal expense | 86,576 34 | |
| Maintenance 1-16% | 3,098 91 | |
| Traffic expense .79% | 2,211 47 | |
| General transportation expense 7.4% | 19,768 92 | |
| General expenses 2.59% | 6,919 12 | |
| Gross earnings tax 3% | 8,014 23 | 282,419 19 |

$   6,372 56
or  2.34%

"The United States Express Company has three classes of offices in the state of Oklahoma: First, where the officers are on salaries; second, where a commission is paid and also an additional expense for delivery wagon, or something of the kind; and third, strictly commission offices. At commission offices the agent for forwarding and receiving expressages is usually paid 10 per cent. on the gross receipts in and out bound business. Some companies do not allow the agent any commission on business received where the charges were paid.

"The gross receipts for state business at these commission offices were: Inbound, $94,945.06; outbound, $56,934.56; total, $151,879.73. Ten per cent. of this amount represents the total

terminal charge on state business at commission offices, which was $15,187.97. The total state business at commission offices where an additional expense was paid other than the agent's commission was: Inbound, $41,553.42; outbound, $22,252.68; total, $63,806.10. Ten per cent. of this amount would be $6,380.61. According to the deductions made by express companies, there should be added to this amount $2,266.03 as Oklahoma's *pro rata* of this extra expense. This would make a total for this item of $8,646.64.

"The total gross receipts of both state and interstate business at salary offices are $754,987.39, and the total expense at salary offices, according to Exhibit I 112, was $113,449.07, or approximately 15 per cent. of the gross proceeds. The total intrastate gross receipts at salary offices doubled were $317,709.43. This last amount is not the collections at salary offices, but is in the in and out bound business; cash collections only being half the amount. All state business has two terminals within the state. This deducted from the total business, both state and interstate, would leave $436,277.94 as the gross amount of interstate business that was destined to or originated in Oklahoma and only takes into consideration one terminal for every interstate shipment. Dividing the terminal expense upon the basis of the business done the same as they do at the commission offices, the state business should be charged with 41⅔ per cent. of the total terminal expense and the interstate business should be charged with 58⅓ per cent. of the total expense. This makes the terminal expense at salary offices on state business $46,589.75.

"The next item of expense is maintenance 1.16 per cent. of the total expense of the system, which, according to the deductions made by the company, charges Oklahoma business with $3,098.91. All the maintenance expense chargeable to Oklahoma in this item has already been cared for in the special deductions made for terminal expenses except .07 per cent. which items are as follows:

| | |
|---|---|
| Maintenance of buildings, fixtures, and grounds | .21% |
| Office equipment | .11 |
| Horses | .15 |
| Vehicles, repairs | .62 |
| Stable equipment | .10 |
| Transportation equipment | .07 |

"The above added makes the 1.16 per cent. used in this exhibit, whereas only .07 per cent. is properly chargeable.

"The next item, traffic expense, .79 per cent. This item includes:

Superintendents _____ .21%
Outside agencies _____ .27
Advertising _____ .03
Traffic associations _____ .06
Stationery and printing _____ .22

"The item of outside agencies has nothing whatever to do with state business. These are agencies that are maintained in towns where this express company does not operate, such as, Canada, England, or Mexico. Traffic associations, which is .06 per cent. should be deducted. This leaves .46 per cent. under this item properly chargeable.

"The next item is general transportation expense, 7.4 per cent. which is a proper charge against Oklahoma business.

"The next item is general expense, 2.59 per cent. This makes a total of 10.52 per cent., items as follows:

Maintenance _____ .07%
Traffic _____ .46
Transportation _____ 7.40
General expense _____ 2.59

Total _____10.52% or $28,593.87

"10.50 per cent. operating expense. Operating expense of entire system is 95 per cent. of gross revenue. Hence 10.52 per cent. reduced to basis of gross revenue is equal to 10.6 per cent. of gross revenue. This makes a total of all expenses $99,018.23, other than the amount paid to railroads, which according to the express companies' estimate is 55 per cent. of the gross proceeds, or $146,931.20, or total expense of $245,941.43.

"The express company has charged an item of $8,014.23, which is 3 per cent. of the gross earnings for taxes. This item was not paid for the year 1911 and has been held unconstitutional by the courts. It is not a proper charge in making an estimate of the net earnings in this case for future guidance.

"The gross receipts of state business as given by the express companies is $267,147.63. To this should be added 41⅔ per cent. of the receipts from money orders, etc., at salary offices $6,254.23, which is $2,605.92, making a total of $289,753.55. From which, deducting the expense above mentioned, $245,949.43, leaves a net income of $23,804.12.

"In this case as in the American Express Company, where it served the purpose best, the express company used the percentage of gross revenue of entire system and in other places, commissions. Should a certain percentage of the gross revenue theory be applied throughout the entire deduction it would give approximately the above result.

"The terminal expense in large cities is higher than what is known as the small town terminal expense, yet the entire terminal expense of the express business in Oklahoma City can be handled by contract at 12½ per cent. of in and out business. However, we are not making our deductions in this case on that basis. We have gone into the analysis of the figures in these exhibits somewhat in detail, and the deductions we have made based upon the figures in this record are as nearly accurate as can be made.

"It is true all of the elements necessary for a complete demonstration of each character of expense is not shown, and we have to deal with the figures as presented in the record, and those referred to in the record in the annual report.

"The Wells Fargo business in Oklahoma was analyzed as shown by Wilmering Exhibit No. 1. Strictly interstate revenue, $263,216.01, after deducting the expenses as shown in this exhibit leaves net balance of $8,868.81, which according to the exhibits is 75.1 per cent. of the value of the property assigned to intrastate business. These deductions were made as shown in that exhibit strictly on the revenue theory, and on the Commission's rates. We have compiled comparative statement of express rates taken from the official and lawfully filed tariffs and which have recently been introduced in evidence before the Interstate Commerce Commission in an express case heard in Boston. The first statement shows the standard rates employed by the express companies, also the rates in Alabama, Arkansas, Florida, Georgia, Michigan, Mississippi, Missouri, Nebraska, South Carolina, Texas, and Virginia. Also the rates that were promulgated by the Commissions of the state of Illinois, Iowa, Minnesota, Oklahoma, and South Dakota, which have been appealed or in litigation.

"It will be observed that the rates appealed from in this case are higher than the rates appealed from in South Dakota, Minnesota, Iowa, and Illinois. They are higher than rates that are now charged in Virginia, and approximately the same as the present rates in Texas. They are higher than rates in South Carolina, Nebraska, Missouri, Mississippi, Michigan, Georgia, Florida, and Alabama, and higher than they are in New York or rates established by the express companies.

"Statement No. 2 is an illustration of the graduate, the per cent. of proportion of the rate per 100 pounds that should be charged for shipments, weighing one pound, five pounds, etc.

"When Oklahoma is compared with the other states, it will be observed that our graduate which has been seriously objected

to and contested in this case is approximately the same as the other states. Heading, 'Stand' means standard scale commonly· used by the express companies throughout the United States. However, a different graduate is imposed in Oklahoma, Arkansas, and Kansas.

"Statement No. 3 shows the per cent. of 100 pounds charge that is contained in our graduate for less than 100 pounds. This is only a verification of the last statement above mentioned.

"Statement No. 4 is a comparison of the express rates in the United States with those in England. In England they have no express companies, but all express business is done by the railroads direct. It will be observed that the charges in England as a rule range from 40 to 50 per cent. of the charges for freight transportation in Oklahoma.

"Statement No. 5 is a comparison of the express rates with first-class freight rates in the states mentioned. This also shows that the proposed Oklahoma rates are above the average of the twenty states named. For distance of· five miles some of the states have a much higher per cent. than the Oklahoma rates, but as the distance increases the Oklahoma per cent. is considerably more than the average of the twenty states.

"It should be remembered that the figures used in the above statement are not the rates now being charged by the express companies in Oklahoma, but the Commission rates and the rates now being charged according to the showing is 20 to 23½ per cent. greater than those in the exhibit. The express rates now. in force in Oklahoma would average approximately 20 per cent. higher than the rates throughout the entire country, and we know of no express rates that are higher even through the mountainous districts than those charged in Oklahoma.

"The statement of the express companies shows that the net earnings range from 5 to 9 per cent. on the gross business done. Not on the capital invested or actually used in this business. The capital actually used in Oklahoma is very insignificant as compared with the gross business done.

"The total value of the property used by the United States Express Company during the year 1910 according to their own inventory filed with the Commission was $1,238,717.55. The total gross business of the company was $17,687,887.73. Oklahoma's percentage of the gross business was 1.52 per cent. If the express company had as much property in the state of Oklahoma according to their gross business done in this state as they did throughout their system, the amount employed for the use of state business would be $18,828.50.

"We found from the deductions hereinbefore made that their net proceeds in Oklahoma was $24,294.09. This is equivalent to 129 per cent. on the capital actually invested in Oklahoma. In reducing express rates a certain per cent. of the percentage of deductions is not taken out of the net proceeds but would only reduce the net proceeds to the extent that this reduction would affect the general transportation charges. The basis of operation of express companies is such that you can throw either heads or tails and they win. Where there are no express companies in England, and the express business is done by the railroads at approximately 50 per cent. of the charges paid in the United States, is a very forceful illustration that the express companies are only a parasite in the world of transportation. They maintain the same necessary relation to the proper transportation of express packages as a mistletoe is to the life of the tree upon which it grafts its sustenance. The more mistletoe the weaker the tree.' Why should the various express companies in the United States pay approximately two and a half million dollars each year, fabulous prices, to general officers and general office expense, and an additional ten million dollars for messenger expense, etc., and an additional ten million dollars for terminal expense, which would be unnecessary to incur if the entire transportation of express packages was under the various railroad systems.

"These last statements are only approximates, but it is fair to assume that the American public is paying from twenty-three to forty million dollars annually that could be saved if express business was done by the railroads directly.

"The express companies insist that they should be permitted to charge sufficient rates to make an income on the amount they are assessed by the state for taxation. It is not the duty of the Commission to consider what elements of value the state may take into consideration in assessing the express companies' property in this state. We can never subscribe to the doctrine that one transportation company can make a contract with another transportation company and then let one of such companies say to the public this contract is worth $500 a mile, and we must be allowed to raise the rates so as to make an earning to pay the interest upon the value of this contract. When the railroad companies grant to the express companies a license or privilege to transact business on their lines, the express companies cannot insist that they should charge a sufficient amount to make dividends on anything other than the actual value of the physical property employed in the business, and the contention that they

should make a certain per cent. on the gross business is as fallacious as the contention that they should be allowed to make earnings upon the value of a contract between two transportation companies.

·"The Supreme Court on the 19th day of December, 1911, made a supplemental order in this case, which is as follows: 'The order heretofore entered by agreement of all parties to this action remanding this cause to the Corporation Commission for introduction of further evidence is hereby modified to this extent, that after all the evidence is in, the Commission shall make new findings of fact and recommendations covering the entire case, and the time to do so is extended sixty days from this date.'

"From all the evidence introduced and from an investigation of express rates in general, we find that the Commission's order reduces the former rates of the express companies from 20 to 23½ per cent. That the express companies can operate under the Commission's order in the state of Oklahoma and make a reasonable return upon their investment. That this can be done notwithstanding the express companies pay the railroads in the state of Oklahoma a greater per cent. of the gross proceeds than they do on the average of their system. The average paid the railroads in the state of Oklahoma is from 53 to 54 per cent. of the gross receipts, while the average of the entire system is about 48 per cent. In many localities where express rates are lower than in Oklahoma, railroad companies only receive 40 per cent. of the gross proceeds. A copy of the contract showing the amount paid by express companies to railroads is incorporated in this record.

"In the first part of this opinion which had been prepared before receiving the supplemental order of the Supreme Court, we confined ourselves to a discussion of the evidence introduced upon the rehearing by the express companies and arrived at substantially the same conclusions set forth in our former opinion. One of the best tests to determine the correctness of deductions based upon receipts and expenses of the entire system, as introduced in this record, is to compare the rates in force in other states. In making this comparison, we have made it more especially to ascertain whether any particular rate in the schedule promulgated is out of line. For the first ten miles in Oklahoma, our rates provide for 30 cents per 100 pounds, while in Minnesota, Iowa, Virginia, Mississippi, and Arkansas 40 cents is charged. Missouri charges 25 cents from the first five miles and 35 cents from ten miles. Alabama, Georgia, South Carolina;

South Dakota charge 30 cents, same as Oklahoma. Nebraska 37½ cents, Michigan 50 cents, Florida 35 cents for five miles and 40 cents for ten miles.

"We see no reason why 40 cents per 100 pounds should not apply for the first ten miles in line with the majority of the other states, and the mileage should be rearranged as follows:

### Rates Applying on Shipments of Merchandise.

| Miles | $.40 | $.50 | $.60 | $.70 | $.85 | $1.00 | $1.20 | $1.40 | $1.60 | $1.80 | $2.00 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Rates per 100 lbs. | 30 | 50 | 70 | 90 | 120 | 150 | 190 | 240 | 290 | 340 | 400 |

Packages Less than One Hundred Pounds.

| Miles | $.40 | $.50 | $.60 | $.70 | $.85 | $1.00 | $1.20 | $1.40 | $1.60 | $1.80 | $2.00 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 and under | .25 | .25 | .25 | .25 | .25 | .25 | .25 | .25 | .25 | .25 | .25 |
| 2 and over 1 | .25 | .25 | .25 | .25 | .25 | .25 | .25 | .25 | .25 | .30 | .30 |
| 3 and over 2 | .25 | .25 | .25 | .25 | .25 | .25 | .30 | .30 | .30 | .35 | .35 |
| 4 and over 3 | .25 | .25 | .25 | .25 | .25 | .30 | .30 | .30 | .30 | .35 | .40 |
| 5 and over 4 | .25 | .25 | .25 | .25 | .30 | .30 | .30 | .30 | .35 | .40 | .45 |
| 6 and over 5 | .25 | .25 | .30 | .30 | .30 | .30 | .35 | .35 | .40 | .45 | .50 |
| 7 and over 6 | .25 | .25 | .30 | .30 | .30 | .35 | .35 | .40 | .40 | .45 | .50 |
| 8 and over 7 | .25 | .30 | .30 | .30 | .30 | .35 | .35 | .40 | .45 | .50 | .55 |
| 10 and over 8 | .30 | .30 | .30 | .30 | .35 | .40 | .40 | .45 | .50 | .55 | .60 |
| 15 and over 10 | .30 | .30 | .35 | .35 | .40 | .45 | .50 | .55 | .60 | .65 | .70 |
| 20 and over 15 | .30 | .35 | .35 | .35 | .40 | .50 | .55 | .60 | .70 | .75 | .80 |
| 25 and over 20 | .30 | .35 | .35 | .40 | .45 | .50 | .60 | .65 | .75 | .85 | .90 |
| 30 and over 25 | .30 | .35 | .40 | .40 | .45 | .55 | .65 | .70 | .80 | .90 | 1.00 |
| 35 and over 30 | .35 | .40 | .40 | .45 | .50 | .55 | .70 | .75 | .85 | .95 | 1.05 |
| 40 and over 35 | .35 | .40 | .45 | .45 | .50 | .60 | .75 | .80 | .90 | 1.05 | 1.15 |
| 45 and over 40 | .35 | .40 | .45 | .50 | .55 | .65 | .80 | .85 | 1.00 | 1.10 | 1.25 |
| 50 and over 45 | .35 | .45 | .50 | .50 | .60 | .70 | .85 | .95 | 1.05 | 1.20 | 1.25 |
| 55 and over 50 | .40 | .45 | .50 | .55 | .65 | .75 | .90 | 1.00 | 1.15 | 1.30 | 1.45 |
| 60 and over 55 | .40 | .45 | .55 | .55 | .70 | .80 | .95 | 1.05 | 1.20 | 1.35 | 1.55 |
| 65 and over 60 | .40 | .50 | .55 | .60 | .70 | .85 | 1.00 | 1.10 | 1.25 | 1.45 | 1.65 |
| 70 and over 65 | .40 | .50 | .60 | .60 | .75 | .85 | 1.05 | 1.20 | 1.35 | 1.55 | 1.75 |
| 75 and over 70 | .40 | .50 | .60 | .65 | .75 | .90 | 1.10 | 1.25 | 1.40 | 1.60 | 1.80 |
| 80 and over 75 | .40 | .50 | .60 | .65 | .80 | .90 | 1.10 | 1.30 | 1.45 | 1.65 | 1.85 |
| 85 and over 80 | .40 | .50 | .60 | .70 | .80 | .95 | 1.15 | 1.35 | 1.50 | 1.70 | 1.90 |
| 90 and over 85 | .40 | .50 | .60 | .70 | .85 | .95 | 1.15 | 1.35 | 1.55 | 1.75 | 1.95 |
| 100 and over 90 | .40 | .50 | .60 | .70 | .85 | 1.00 | 1.20 | 1.40 | 1.60 | 1.80 | 2.00 |

"The change above suggested will slightly raise the merchandise rates in that commodities can be carried thirty miles for 40 cents as a minimum and 50 miles for 50 cents, instead of 60 miles, and can be carried 70 miles for 60 cents instead of 80 miles. The only change in the basis and graduate is a reduction in mileage of ten miles for the respective charges.

"The recommendation for making the minimum 40 cents per hundred pounds for 30 miles or under is in line with two-thirds of the states above mentioned, and is also suggested in the interest of uniformity.

"We cannot pass without comparing the rates in Illinois put in force by the Commission of that state and shown in exhibits here as being in litigation. The courts of that state held that the Commission had no authority to prescribe express rates. The

Legislature immediately conferred the authority upon the Commission, whereupon it repromulgated the previous litigated rates which are now in effect. Illinois followed largely the same lines of investigation that the Oklahoma Commission did, and had our former opinion and scales of rates before them when they promulgated their rates, which is very apparent from reading the opinion in the Illinois case. It is not practical to make comparisons for exact distances inasmuch as the Oklahoma scale and the Illinois scale do not break on the same mileage.

"The main question to be considered in express rates is the graduate or that portion of the charge that is assessed upon shipments weighing less than 100 pounds. This has been referred to in statement No. 3 in the compilation of the comparison of express rates throughout the United States and England, which shows that this is a subject that has received much attention at the hands of regulative bodies. A graduate may be so arranged that reduction of as much as 20 per cent. of the rate per 100 pounds would have no effect on the graduate and may leave the same rate applicable upon shipments less than 100 pounds. Great care was exercised by the Commission in showing the graduate in this case. It is much higher than the graduate in Illinois which is now in effect and when considered in comparison with all graduates that have been made by regulative bodies it is the most favorable of any to the carriers. Hence the change of the rate per 100 pounds merchandise suggested above from 30 cents to 40 cents for all distances up to 30 miles does not contemplate any change in the graduate other than a change of mileage as herein shown by the table.

"On the next page will be found a comparative table of the graduate now in force in Illinois and the one promulgated by the Commission for Oklahoma. A careful examination of the compilation or exhibits shows that the Oklahoma rates are above the Illinois rates at all points except the 120 and 100 mile haul. Comparing the rate in Illinois at 120 miles with the rate in Oklahoma at 100 miles, the total is only 55 cents below the Illinois scale. If the mileage had been in favor of Oklahoma and 130 miles used instead of 120 miles it would show a total charge of $12.95 or 50 cents more than the Illinois rate. In the above table the figures at the top of the page indicate specific distance at which the rates apply. The figures on the left-hand side of the page indicate the weight of a package and the figures in the main body under the respective states indicate the charge which would be collected in Illinois at the present time or in Oklahoma were the Commission's rates effective.

"Adding up the total mileage shown by the preceding exhibit for both Illinois and Oklahoma, it will be found that the total equals 890 miles in both states, and if a package weighing the different graduates shown from 1 to 100 pounds had been moved each of the distances shown in the exhibit it would have resulted in a total charge of $87.15 in Illinois and $97.15 in Oklahoma, indicating that the rates prescribed by the Commission in Oklahoma was 111 per cent. of the rates now effective in the state of Illinois.

"In statement No. 1, referred to in the first part of these findings of the compilation of express rates throughout the United States and England when the rate is 50 cents per 100 pounds, this figure is maintained for a distance of 20 miles, and generally speaking an additional 10 cents is added up to a distance of 150 miles.

"The rate prescribed for the transportation of money is immaterial so far as the gross proceeds of the express companies are concerned, yet this rate could be the same as now charged by the express companies without being out of line with the rates charged in other states, and would work no material hardship upon the actual transportation of money within this state.

"In the former hearing and in the former opinion much space was devoted to the discussion of milk rates. On page 10 of our former opinion in this case will be found a comparative table showing the Wells Fargo milk rate, the Rock Island, C., B. & Q., and Nebraska Commission rates, the Wisconsin Commission rates, on both milk and cream and the rates promulgated by this Commission. Our rate scheme does not contemplate making two rates, one for milk and one for cream, but following the usage and custom of all other states, except Wisconsin, the milk and cream rate is the same. In view of the fact that the milk and cream rate prescribed by this Commission is lower than any other rate in force in this commodity, we are of the opinion that the rate known as the Rock Island, C., B. & Q., and Nebraska Commission rates, should be substituted in lieu of the rates heretofore prescribed by the Commission.

"We are clearly of the opinion that the recommendations herein suggested are most liberal in view of the facts in this record. We have analyzed the earnings as submitted by the express companies without investigating the correctness of these reports. We have not the necessary funds available to make an examination of the express companies' books and have made all the findings and all the deductions in this case from statements of the express companies. However, to verify our con-

clusions we have submitted herewith the reasonableness of the rates from a relative standpoint, that is, the reasonableness of the rate promulgated by the Commission as compared with the rates in force by the express companies in other states where they operate under similar circumstances, and in many of which they do less express business than they do in Oklahoma.

"Our conclusions have been more than verified from a relative standpoint. An examination of which can be ascertained from statements 1, 2, 3, 4, and 5, hereinbefore explained.

"It is therefore ordered that the foregoing analysis of the exhibits and evidence introduced by the express companies in the rehearing and the recommendations herein be transmitted to the Supreme Court as the findings of fact and recommendations of the Commission in pursuance of the order of the Supreme Court."

The comparison of express rates in force in the different states is attended with less difficulty than freight rates. The volume of the business of an express company reduces its fixed expense but little, whilst that of the freight business has much to do with the rate. If the express companies are operating in Alabama, Arkansas, and Illinois, and other states paying the railroad the same percentage as they do in Oklahoma, the volume of business would have little to do in reducing the expenses of the services performed by the express companies. The record shows that the appellants are engaged in the express business in some or all of the states in which those compared rates are in force. If the fixed charge paid by the express company to the railroad companies was different from that paid in Oklahoma, such evidence was easily accessible to the appellants; more so than the state, and the presumption is that if it had been different, and such fact would have been favorable to the appellants, they would have brought the same into this record in order that they might have availed themselves of it. *A., T. & S. F. Ry. Co. v. Davis & Young*, 26 Okla. 359, 109 Pac. 551. It appearing from the record that express rates as low or lower than these prescribed by the order under review are in force in other states in which one or more of the appellants do business, and there being nothing in the record to show that their fixed or contract charges with the railroad companies are different from

that in the state of Oklahoma, that is sufficient evidence to support the *prima facie* presumption that the law creates in favor of the order of the Commission. *Ft. Smith & W. R. Co. v. State,* 25 Okla. 866, 108 Pac. 407.

The rule is the *prima facie* presumption that the order is just, reasonable, and correct by force of section 22, art. 9 (section 240, Williams' Ann. Ed.), of the Constitution of this state, is a presumption arising upon the finding of the Commission; that the order based upon the facts in the record is presumed, upon appeal in this court, to be *prima facie* just, reasonable, and correct, subject to be rebutted or overcome by the facts in the record as found and weighed by this court on review. *A., T. & S. F. Ry. Co. v. State et al.,* 23 Okla. 210, 100 Pac. 11, 21 L. R. A. (N. S.) 908; *Id.,* 23 Okla. 510, 101 Pac. 262. This court in reviewing this order of the Commission sits in a legislative and administrative capacity. *A., T. & S. F. Ry. Co. v. Love,* 23 Okla. 192, 99 Pac. 1081; *A., T. & S. F. Ry. Co. v. State et al.,* 23 Okla. 510, 101 Pac. 262; *Prentis v. Atlantic Coast Line Co.,* 211 U. S. 210, 29 Sup. Ct. 67, 53 L. Ed. 150. This court sitting here in a legislative capacity reviewing the action of the Commission is bound with the constitutional limitation that the action of the Commission is *prima facie* reasonable and just. If there is any evidence reasonably tending to support the order, then the burden is upon the appellants to show by evidence in the record so strong and conclusive as to overcome all presumptions in its favor that the same is unreasonable and unjust. Unless they meet that burden in this legislative review, the order of the Commission must be affirmed. Under the rule laid down by the Supreme Court of the United States in the Prentis case, heretofore referred to, the action of the court in this case is purely legislative and not judicial.

In *Simpson et al. v. Shepard,* 230 U. S. 352, 33 Sup. Ct. 729, 51 L. Ed. 1511, it is said:

"The rate-making power is a legislative power and necessarily implies a range of legislative discretion. We do not sit as a board of revision to substitute our judgment for that of the Legislature, or of the commission lawfully constituted by it, as to matters within the province of either." * * * The case

falls within a well-defined category. Here we have a general schedule of rates, involving the profitableness of the intrastate operations of the carrier, taken as a whole, and the inquiry is whether the state has overstepped the constitutional limit by making the rates so unreasonably low that the carriers are deprived of their property without due process of law, and denied the equal protection of the laws. The property of the railroad corporation has been devoted to the public use. There is always the obligation springing from the nature of the business in which it is engaged—which private exigency may not be permitted to ignore—that there shall not be an exorbitant charge for the service rendered, but the state has not seen fit to undertake the service itself, and the private property embarked in it is not placed at the mercy of legislative caprice. It rests secure under the constitutional protection, which extends not merely to the title, but to the right to receive just compensation for the service given to the public. * * * The ascertainment of that value is not controlled by artificial rules. It is not a matter of formulas, but there must be a reasonable judgment, having its basis in a proper consideration of all the relevant facts."

In *Knott et al. v. St. Louis, K. C. & C. R. Co. et al.,* 230 U. S. 512, 33 Sup. Ct. 983, 57 L. Ed. 1596, it is said:

"We have then in substance the same question that was presented in the Minnesota cases with respect to the evidence of the additional cost of transacting the intrastate business. There are numerous expressions of judgment on the part of witnesses as to the amount of the intrastate cost, some estimating it on the revenue basis and others on the ten-mile basis. The estimates took a similarly wide range, making the cost of the intrastate or short haul business from two to eight or more times that of the interstate or long haul business. There was also testimony on each side as to certain tests, but these covered only a few days. We can reach no different conclusion from that stated in the decision to which we have referred that, in an issue of this character, involving the constitutional validity of state action, general estimates of the sort here submitted with respect to a subject so intricate and important should not be accepted as adequate proof to sustain a finding of confiscation."

The order of the Commission will be modified to conform to the recommendation of the Commission as proposed by order of December 26, 1911, No. 40, hereinbefore set out (Fifth Annual Report of the Corporation Commission, 1912, vol. 1, pp.

580, 594), and as modified the same is affirmed, and the rates in accordance with said modification are declared to be in force from August 1, 1909.

All the Justices concur.

ON REHEARING.

Counsel for the express companies refer to *Pioneer Telephone & Telegraph Co. v. Westenhaver et al.,* 23 Okla. 226, 99 Pac. 1019, *Pioneer Telephone & Telegraph Co. v. Westenhaver et al.,* 29 Okla. 429, 118 Pac. 354, 38 L. R. A. (N. S.) 1209, *Hine v. Wadlington,* 33 Okla. 173, 124 Pac. 299, and *Western Union Telegraph Co. v. State,* 31 Okla. 415, 121 Pac. 1069, as being against the comparison of rate theory. In these cases the comparison of rate rule was not invoked. · No evidence on that theory was offered. Therefore these cases cannot be considered as in point for such contention. As to *Midland Valley R. Co. v. State,* 24 Okla. 817, 104 Pac. 1086; *K. C., M. & O. Ry. Co. et al. v. State,* 24 Okla. 822, 104 Pac. 1091; *A., T. & S. F. Ry. Co. et al. v. State,* 24 Okla. 824, 104 Pac. 1090; *St. L. & S. F. R. Co. et al. v. State,* 24 Okla. 826, 104 Pac. 1088; *St. L. & S. F. R. Co. et al. v. State,* 24 Okla. 828, 104 Pac. 1087; *St. L., I. M. & S. Ry. Co. et al. v. State,* 24 Okla. 830, 104 Pac. 1092; *M., K. & T. Ry. Co. et al. v. State,* 24 Okla. 832, 104 Pac. 1089; *A., T. & S. F. Ry. Co. et al. v. State,* 24 Okla. 834, 104 Pac. 1089; *C., R. I. & P. Ry. Co. et al. v. ·State,* 24 Okla. 835, 104 Pac. 1092— the syllabus is as follows:

"By section 22, art. 9, of the Constitution (Bunn's Ed. sec. 234), it becomes the duty of the Corporation Commission, upon hearing an order proposed to fix the rates to be charged by a railway company for services for hauling intrastate shipments, to make finding of facts upon which the order of the Commission is based, and, on an appeal from such order, to certify the facts so found by it to this court.

"(a)   When the Corporation Commission, .in making an order fixing rates which a railway company may charge for hauling intrastate freight, fails to make a finding of facts, and to certify same· to the Supreme Court on appeal 'from such or-

der, such court may, under said section of the Constitution, remand the case to the Commission, with directions to find the facts upon which the Commission based its order, and to certify same to the court before the appeal is finally decided."

In this jurisdiction the syllabus declares the law of the case, and the foregoing is all that was decided in said cases. The other cases referred to merely follow the rule announced in the Midland Valley Railroad Company case, in which only evidence as to comparative rates was introduced before the Commission. No evidence was received whatever as to the values of the property of the railroad company within the state, and the entire earnings within the state, both interstate and intrastate, freight, passenger, and miscellaneous, and also the entire expense of operation, including that for necessary repairs, etc. It was within the discretion of this court to remand that case for evidence to be introduced on that theory. It appears also from the opinion that the appeal was sought to be dismissed on motion of the state on the ground that no findings of fact were made by the Commission. We quote from the opinion in 24 Okla. at page 820, 104 Pac. 1087, where it says:

"It was the duty of the Commission to make the findings of facts upon which this order is based, and, having failed so to do, it cannot be permitted for that reason to have this court dismiss this appeal, and the motion is accordingly overruled."

In that case we announced the rule that the Commission in fixing rates wherever it was practicable should receive evidence upon all issues or theories upon which the order might be justified. When such is done and upon any reasonable theory there is evidence before the Commission to sustain the order, and there is not evidence in the record to overcome and destroy the supporting evidence, the order must stand before this court, because on review here the order of the Commission, if there is any evidence to sustain it, is *prima facie* reasonable and just. This is a direct proceeding by appeal in a legislative way to review the action of the Commission, but certain limitations are placed upon this court in the exercise of the power of review. That is that the order of the Commission is *prima facie* just and reasonable, and the burden is upon the party assailing the same to de-

stroy, and not only overcome that presumption, but also by evidence to show that the order is erroneous or unjust and unreasonable.

There are exceptions to the rule of "adequate return on investments" as to the fixing rates. *Louisville & N. R. Co. v. Railroad Commission of Alabama et al.* (D. C.) 208 Fed. 35. The fact that this court in exercising its discretion to have as complete a record as practicable for the purpose of determining as to the justness or reasonableness of the order complained of in remanding with directions that evidence be taken on the "adequate return on the investment" theory did not commit itself to the rule that an order of the Commission would not be sustained on the comparison of rate theory, when the evidence on that theory supported the order. However, we think that the record shows that the Commission has considered this case on all theories, not only on the "comparison of rate theory," but also on the "adequate return on investment" theory, notwithstanding the difficulty presented as to the separation of interstate and intrastate business and expenses, etc. See, also, *Wood et al. v. Vandalia Railroad Co.*, 231 U. S. 1, 34 Sup. Ct. 7, 58 L. Ed. —, decided by the Supreme Court of the United States October 20, 1913.

The petition for rehearing will be denied.

All the Justices concur.